**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 7 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

RANDALL EUGENE CANNON,

        Petitioner-Appellant,

v.

GARY GIBSON, Warden, Oklahoma
State Penitentiary,

        Respondent-Appellee.

No. 99-6311

---

Appeal from the United States District Court
for the W. District of Oklahoma
(D.C. No. 97-CV-346-L)

---

Jack Fisher, Edmond, Oklahoma, for Petitioner-Appellant.

William L. Humes, Assistant Attorney General of Oklahoma, (W. A. Drew
Edmondson, Attorney General of Oklahoma, with him on the brief), Oklahoma
City, Oklahoma, for Respondent-Appellee.

---

Before **SEYMOUR, LUCERO,** and **MURPHY,** Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

# I. INTRODUCTION

Randall Eugene Cannon appeals from the district court's denial of his federal habeas corpus petition brought pursuant to 28 U.S.C. § 2254. In his petition, Cannon lodged numerous challenges to his Oklahoma first degree murder and arson convictions and to his death sentence. The district court denied relief as to each claim but granted Cannon a certificate of appealability ("COA") to raise five issues on appeal. *See supra* section II.B. After conducting a case management conference, this court granted Cannon a COA to raise three additional issues. *See supra* section II.B. After a thorough review of the record and consideration of Cannon's appellate contentions, this court concludes that Cannon is not entitled to habeas relief. Accordingly, this court exercises jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(c) and **affirms** the district court's denial of Cannon's § 2254 habeas corpus petition.

# II. BACKGROUND

## A. Factual Background

Cannon and his co-defendant Loyd LaFevers were convicted in state court of murdering eighty-four-year-old Addie Hawley. The Oklahoma Court of Criminal Appeals ("OCCA") recounted the facts of the crime as follows:

> On June 24, 1985, [LaFevers] and . . . Cannon decided to steal a car after [LaFevers'] car broke down in a northwest Oklahoma City

neighborhood.  After selecting a house in the neighborhood, the two men forced their way into the home of eighty-four year old Addie Hawley.  They ransacked her home, taking eight dollars from her purse, along with the keys to her car and the garage door opener. The two took her out of the house and into the car.  Cannon, who was driving the car, drove for just over a mile before pulling over so that they could put Hawley in the trunk.

The two men drove to a convenience store where they bought a two liter bottle of orange soda.   After drinking some of the soda, they poured the rest out and filled the bottle with gasoline. [LaFevers] directed Cannon to drive to a secluded area where he removed Hawley from the trunk of the car.  Although there was evidence presented at trial that indicated that Hawley was raped, neither defendant admitted having committed rape or sodomy.  Each man indicated in his pretrial confession to police and during his testimony at trial that the other man had committed the sexual offenses while he remained as a lookout.

After the completion of the sex acts, one of the two men, again each blamed the other, poured gasoline from the orange soda bottle on Hawley and set her on fire.  They drove the car a short distance away and also set it on fire.

Rescue personnel were called to the scene soon after the fires were set.  Although Hawley had been burned over sixty percent of her body, she was still alive.  She had suffered a blunt injury to the forehead and had two black eyes along with multiple cuts and bruises.  She died a short time after being taken to the hospital.

*Lafevers v. State*, 819 P.2d 1362, 1364 (Okla. Crim. App. 1991) (footnote omitted); *see also Cannon v. State*, 827 P.2d 1339, 1340-41 (Okla. Crim. App. 1992) (noting that facts of Cannon's case were detailed in the OCCA's original opinion in *Lafevers*); *Cannon v. State*, 904 P.2d 89, 100-01 (Okla. Crim. App. 1995) (*Cannon I*) (setting forth in detail contents of Cannon's written statement to police and taped confession).

## B. Procedural Background

An Oklahoma jury found Cannon guilty of first degree murder, rape, forcible sodomy, and arson.[1]  The jury sentenced Cannon to death for the murder conviction.  On direct appeal, the OCCA vacated the rape and sodomy convictions, concluding they were not supported by sufficient evidence; it affirmed the murder and arson convictions and death sentence.  *See Cannon I*, 904 P.2d at 102, 108.  Cannon then filed an application for post-conviction relief, along with a request for an evidentiary hearing, directly with the OCCA.[2]  The OCCA rejected the request for an evidentiary hearing and denied Cannon's application for post-conviction relief.  *See Cannon v. State*, 933 P.2d 926, 930 (Okla. Crim. App. 1997) (*Cannon II*).

After the OCCA denied his request for post-conviction relief, Cannon filed a 28 U.S.C. § 2254 habeas petition in federal district court.  The district court denied relief as to each of the numerous claims set forth in the petition.  It did, however, grant Cannon a COA, *see* 28 U.S.C. § 2253(c), to raise the following five claims on appeal: (1) statements Cannon made after his arrest were

---

[1]Cannon's convictions on these same charges following a first trial were reversed by the OCCA on the ground that the trial court should have severed Cannon's trial from that of his co-defendant.  *See Cannon v. State*, 827 P.2d 1339, 1341 (Okla. Crim. App. 1992).

[2]*See* Okla. Stat. Ann. tit. 22, § 1089 (providing that original application for post-conviction relief where defendant is under penalty of death shall be filed directly with OCCA).

-4-

improperly admitted at trial because the statements were fruits of an illegal arrest and detention; (2) evidence seized during a warrantless search of Cannon's home was improperly admitted at trial; (3) trial counsel was constitutionally ineffective during the guilt phase of the trial; (4) prosecutors violated Cannon's due process rights when they failed to disclose, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), evidence favorable to the defense; and (5) trial counsel was constitutionally ineffective during the penalty phase of the trial.

This court conducted a case management conference. *See In re*: Procedures for the Management of Death Penalty Matters issued Apr. 8, 1999. At the conclusion of that conference, Judge Porfilio issued a case management order granting Cannon a COA as to the following additional three claims: (1) the trial court denied Cannon his constitutional right to an impartial jury when it removed a prospective juror for cause; (2) the aiding and abetting instructions given at trial allowed the jury to convict Cannon of malice aforethought murder without any showing that he intended to kill the victim; and (3) the death penalty is invalid because the trial court failed to instruct the jury, pursuant to *Tison v. Arizona*, 481 U.S. 137 (1987) and *Enmund v. Florida*, 458 U.S. 782 (1982), to make findings as to whether Cannon had the specific intent to kill the victim.[3]

---

[3]The case management order further provided: "Any request for leave to grant additional issues in the [COA] must be raised by written motion filed not

(continued...)

-5-

# III. ANALYSIS

## A. Standard of Review

Because Cannon filed his § 2254 habeas petition on September 29, 1997, well after the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),[4] this court reviews Cannon's petition pursuant to the revised standards of review set out in 28 U.S.C. § 2254(d) and

---

[3](...continued)
later than ten days after the date of this order. . . . The Clerk shall submit motions for modification of the [COA] to the merits panel . . . . Unless otherwise ordered by the merits panel, no issue shall be included in the briefs other than those [for which COA has been granted]." Case Management Order issued Oct. 4, 1999, at para. 6; *see also In re*: Procedures for the Management of Death Penalty Matters issued Apr. 8, 1999, at para. 2 (noting that court may "address issues regarding issuance of a [COA]" during case management conference); *id.* at para. 3 ("The court will issue a scheduling order following the conference. In that order, the court will set all appropriate deadlines.").

Without filing a request for an expanded COA, Cannon's counsel included in his appellate brief twelve issues for which no COA had been granted. Counsel asserted he briefed the issues "to preserve [them] for future review," but asked this court to "review [them] for Constitutional error, and grant [Cannon] relief." We specifically admonish counsel for failing to comply with this court's case management order and note that the failure to comply with that order constitutes a waiver of the right to seek an expanded COA. Nevertheless, we have reviewed each of the additional twelve issues raised by Cannon and conclude that the district court's resolution of those claims is neither debatable among jurists of reason nor "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 120 S. Ct. 1595, 1604 (2000) (quotation omitted). Accordingly, Cannon has not made "a substantial showing of the denial of a constitutional right" and therefore is not entitled to a COA as to these additional twelve claims. 28 U.S.C. § 2253(c)(2); *see also Slack*, 120 S. Ct. at 1603-04.

[4]Pub. L. No. 104-132, 110 Stat. 1214 (1996).

(e).[5] *See Moore v. Gibson*, 195 F.3d 1152, 1160-61 (10th Cir. 1999), *cert. denied*, 530 U.S. 1208 (2000). This court recently stated as follows regarding the revised standards of review set forth in § 2254(d)(1):

> The Supreme Court . . . elucidated the opaque language of § 2254(d)(1) in *Williams v. Taylor*, 120 S. Ct. 1495, 1518-23 (2000) (opinion of O'Connor, J.). Speaking for a majority of the Court in her separate concurring opinion, Justice O'Connor noted the AEDPA allows a federal court to grant habeas relief under § 2254(d)(1) only if the relevant state-court decision was either "contrary to" or "an unreasonable application of" established Supreme Court precedent. *See id.* at 1519. As for § 2254(d)(1)'s "contrary to" clause, Justice O'Connor noted that a state-court decision would be contrary to the Court's clearly established precedent in two circumstances: (1) "the state court applies a rule that contradicts the governing law set forth in [the Court's] cases"; or (2) "the state court confronts a set of facts

---

[5]The pertinent subdivisions of § 2254 provide as follows:
   (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
      (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
      (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
   (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.
28 U.S.C. § 2254(d), (e).

that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from" the result reached by the Supreme Court. *Id.* at 1519, 1519-20. Under the "unreasonable application" clause, on the other hand, a federal habeas court may grant the writ only if "the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 1523. To be clear, "[u]nder § 2254(d)(1)'s 'unreasonable application' clause . . . , a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 1522.

*Thomas v. Gibson*, 218 F.3d 1213, 1219-20 (10th Cir. 2000).

To the extent that the state court has not addressed the merits of a claim and "the federal district court made its own determination in the first instance," this court reviews "the district court's conclusions of law de novo and its findings of fact, if any, for clear error." *LaFevers v. Gibson*, 182 F.3d 705, 711 (10th Cir. 1999).

**B. Guilt Phase Issues**

*1. Confession Obtained in Violation of the Fourth Amendment*

In his habeas petition, Cannon argued that the Oklahoma state courts committed constitutional error when they refused to suppress certain statements he made shortly after his arrest. In particular, Cannon argued that his arrest was illegal because the outstanding warrants for which he was arrested were invalid. He thus argued the custodial statements were fruits of an illegal arrest. The

district court concluded that it was barred from reaching the merits of Cannon's claim because Cannon received an opportunity for full and fair litigation of the claim in state court. *See Stone v. Powell*, 428 U.S. 465, 494 (1976) ("[W]e conclude that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment Claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." (footnote omitted)).

On appeal, Cannon asserts the district court erred in applying *Stone* to bar habeas relief because he never received a full and fair opportunity to litigate this claim in state court.[6] Whether Cannon had a full and fair opportunity to litigate his Fourth Amendment claim in state court is a question of law this court reviews *de novo*. *See Miranda v. Cooper*, 967 F.2d 392, 401 (10th Cir. 1992). This court has held that "*Stone*'s 'opportunity for full and fair consideration' and/or 'litigation' includes, but is not limited to[,] the procedural opportunity to raise or otherwise present a Fourth Amendment claim[] and the full and fair evidentiary hearing contemplated by *Townsend v. Sain*, 372 U.S. 293 (1963)." *Id.* That

---

[6]As noted by the district court, Cannon's illegal-arrest claim is closely related to his claim under *Brady v. Maryland*, 373 U.S. 83 (1963). That is, Cannon asserts that the prosecutor's *Brady* violation prevented him from obtaining a full and fair litigation of his Fourth Amendment claim in state court. Cannon's *Brady* claim is analyzed below. *See infra* section III.B.4.

standard further "contemplates recognition and at least colorable application of the correct Fourth Amendment constitutional standards." *Gamble v. Oklahoma*, 583 F.2d 1161, 1165 (10th Cir. 1978). Upon *de novo* review of the district court order and the entire state court record, this court agrees that Cannon had a full and fair opportunity to litigate this claim in state court.

Prior to trial, Cannon filed a discovery motion asking that the trial court order the prosecution to disclose "[c]opies of any arrest warrants and affidavits obtained or issued in this case." Although the record does not disclose whether the trial court acted on this request, it did hold a hearing regarding the propriety of Cannon's arrest. Detective Ron Mitchell of the Oklahoma City Police Department testified that he arrested Cannon because he "had an outstanding . . . misdemeanor warrant and then also a couple of back traffic tickets." Mitchell testified he learned of the outstanding warrants by calling the police department's Crime Information Unit ("CIU"); the CIU then called the issuing entity to verify that the warrants were still valid. According to Mitchell, the CIU verified the existence of both the misdemeanor warrant and traffic warrants. Mitchell testified that he never personally verified the existence of the misdemeanor warrant, but that the traffic warrants "had to be in hand in order to book somebody on those charges."

-10-

Cannon testified that no outstanding warrants existed on the day he was arrested and that he had previously paid all fines related to the misdemeanor and traffic charges. He requested that the trial court hold its ruling in abeyance until he could present receipts for payment of the fines. Cannon also asked that the prosecution produce the warrants for examination by the trial court. In response, the prosecution argued that it was not necessary to produce the warrants because the trial court could rely on the testimony of Mitchell. The trial court rejected Cannon's request, ruling as follows: "The Defendant's motion to hold in abeyance the ruling is overruled, and the motion to suppress the evidence of the arrest is overruled. All right. The evidence will be admitted."

When Cannon raised this claim on direct appeal, the OCCA noted in a footnote that "[a] copy of the [misdemeanor] warrant was submitted as a supplemental record on appeal and accepted as tendered for filing on April 1. 1994." *Cannon I*, 904 P.2d at 95 n.7. The OCCA held the warrant was valid on its face "and any possible error would be harmless because Cannon has not shown he was prejudiced." *Id* at 95. Although there is no indication the OCCA was provided with copies of the traffic warrants, that court also held that "the traffic warrants appear sufficient to uphold the legality of the arrest." *Id*.[7]

---

[7] The OCCA's rationale for upholding the sufficiency of the traffic warrants is as follows:

(continued...)

Like the district court, we conclude this procedural history demonstrates that the state court proceedings sufficed to provide Cannon with an opportunity for full and fair litigation of this claim. When Cannon first raised this claim, the trial court conducted a hearing outside the presence of the jury, at which time it heard testimony and received all evidence that was readily available to be presented. Based upon the evidence presented during the hearing, the trial court concluded that Cannon's arrest comported with the Fourth Amendment and ruled that all evidence flowing from Cannon's arrest was admissible. When this claim was raised on direct appeal, the OCCA allowed the record to be expanded with a copy of the arrest warrant. *See Cannon I*, 904 P.2d at 95 n.7. There is no indication in the record that Cannon attempted or requested to have the record expanded with other materials relating to the outstanding warrants that he now identifies as relevant in his § 2254 habeas petition. The OCCA reviewed Cannon's claim in light of the evidence presented to the trial court as well as the additional material first presented as part of his direct appeal. Based on that

[7](...continued)
The arresting officers testified that they knew of one outstanding misdemeanor warrant and two traffic warrants. While they did not have the warrants at the time of arrest, evidence showed that they needed a copy of the traffic warrants in order to book Cannon on those charges. The record clearly indicates the warrants existed and would have been sufficient to sustain the arrest without the misdemeanor warrant.
*Cannon I*, 904 P.2d at 95 n.11.

review, the OCCA rejected Cannon's challenge to the legality of his arrest. *See id.* at 95.

Despite this procedural history, Cannon asserts on appeal that he did not have a full and fair opportunity to litigate this claim because the prosecution never produced copies of the relevant warrants prior to or at the suppression hearing. This court is not convinced, under the particular facts of this case, that the prosecution's failure to produce the warrants at the suppression hearing deprived Cannon of his ability to fully and fairly litigate his illegal-arrest claim. First, the district court specifically found that all of the documents relevant to the validity of the misdemeanor warrant were in the files of the Oklahoma County District Court and were freely available to Cannon for a period of several years prior to his trial.[8] Furthermore, the opinion of the OCCA in *Cannon I* makes clear

---

[8]In the alternative, Cannon asserts that his trial counsel provided ineffective assistance in failing to obtain the relevant materials prior to trial and that counsel's ineffective assistance denied him a full and fair opportunity to litigate his illegal-arrest claim. In rejecting this claim, the district court concluded that Cannon could not satisfy his burden under 28 U.S.C. § 2254(d) because he had failed to support this particular claim of ineffective assistance with argument or citation to legal authority. We agree. With regard to this claim, Cannon's habeas petition simply alleged as follows:

> This is a ground for relief pleaded in the alternative. Should the Court determine petitioner is not entitled to relief in ground four (4) relating to suppression of petitioner's confession based upon an illegal arrest, and the denial of relief is based upon error or mistake of trial counsel, then petitioner claims counsel was ineffective in not investigating, presenting and preserving this Constitutional error in

(continued...)

-13-

that the parties were afforded an opportunity to supplement the direct appeal record with the documentary material relevant to this claim. *See id.* at 95 n.7. Accordingly, Cannon cannot claim that the prosecution's failure to produce relevant documents precluded him from obtaining a full and fair litigation of his illegal-arrest claim.

### 2. *Warrantless Search of Home*

In addition to his illegal-arrest claim, Cannon also asserted in his habeas petition that a warrantless search of his home on the morning following his arrest violated the Fourth Amendment. In particular, Cannon asserted that Oklahoma failed to prove that he knowingly and voluntarily consented to the search. As with Cannon's illegal-arrest claim, the district court concluded that a review of the merits of this claim was barred by *Stone*. Upon *de novo* review, *see Miranda*,

---

[8](...continued)
violation of the standards as established by Strickland, supra. Cannon's conclusory assertion that counsel was ineffective, along with a bald reference to *Strickland v. Washington*, 466 U.S. 668 (1984) is simply not sufficient to preserve this claim. Even assuming, however, that Cannon's § 2254 habeas petition did adequately set forth a claim that his trial counsel was ineffective in failing to obtain the relevant documents from the court files and present them at the suppression hearing, such a claim is procedurally barred because it has never been presented to the Oklahoma state courts. *See infra* section III.B.3 (holding that Cannon's claims of constitutionally ineffective assistance of counsel relating to the guilt phase of his trial are procedurally barred because they were not presented in Cannon's state petition for post-conviction relief).

967 F.2d at 401, this court agrees that Cannon was afforded a full and fair opportunity to litigate this claim in state court. *See Stone*, 428 U.S. at 494.

Cannon's primary contention on appeal is that he was denied a full and fair opportunity to litigate this claim because the state trial court did not make specific, express findings that Cannon actually consented to the search or that any such consent was voluntary. A review of the state trial record clearly demonstrates, however, that the state trial court implicitly made the requisite findings after a full and fair evidentiary hearing on the validity of the warrantless search. The state trial court held an *in camera* hearing on the validity of the warrantless search pursuant to *Jackson v. Denno*, 378 U.S. 368 (1964). At both that hearing and later before the jury, Lieutenant Pacheco of the Oklahoma City Police Department testified at length regarding the circumstances surrounding Cannon's consent to the search. In summary, Pacheco testified that Cannon consented to the search of his home upon the condition that his parents or brother would be present during the search. He further testified that Cannon was not physically impaired at the time he gave consent and that he was not "hurr[ied]" into providing consent.

During his own testimony at the *Jackson v. Denno* hearing, Cannon testified that the signature on the consent form the prosecution had attempted to

introduce was not his. [9] He also testified that he did not remember giving consent to a search of his home. At the request of his trial counsel, Cannon submitted an exemplar of his signature to the trial court for comparison with the signature on the photocopied consent form.

On direct appeal, the OCCA discussed the evidence presented at the *Jackson v. Denno* hearing as well as the evidence presented by Pacheco in open court. *See Cannon I*, 904 P.2d at 95-96. The OCCA noted that the "trial court found Cannon gave knowing and voluntary consent to search." *Id*. at 96. The OCCA concluded that the trial court's finding was well supported by Pacheco's testimony both during the *in camera* hearing and before the jury. *See id.*

Despite the litigation of this claim in a *Jackson v. Denno* hearing, at trial, and on direct appeal to the OCCA, Cannon argues that the state courts did not actually consider this Fourth Amendment claim because the trial court did not make specific, explicit findings regarding the existence and voluntariness of his consent and because the OCCA simply affirmed the trial court's "non-existent" findings. Cannon equates the failure to make specific, explicit findings to a

_____

[9]During the *in camera* hearing, the prosecution attempted to introduce a photocopy of a consent form signed by Cannon prior to the search. The prosecution stated for the record that the original consent form had been lost in the interim between Cannon's first and second trials. When Cannon asserted a "best evidence" objection to the admission into evidence of the photocopy, the prosecution withdrew it and recalled Pacheco to testify that he received verbal consent to search Cannon's home.

failure to consider his arguments and cites *Reed v. Farley*, 512 U.S. 339, 346 (1994), for the proposition that the *Stone* bar should not apply on collateral review if the state court failed to consider a petitioner's arguments.

Under the facts of this case, we cannot conclude that the state trial court's failure to make specific, explicit findings constitutes a failure to consider Cannon's arguments regarding the validity of the warrantless search. As the procedural history set out above clearly demonstrates, Cannon's arguments regarding the validity of the search were extensively litigated before the trial court. The trial court's decision to admit the fruits of the search after the *in camera* hearing and Pacheco's testimony in open court certainly constitutes an implicit determination that Cannon knowingly and voluntarily consented to the search. Furthermore, on direct appeal the OCCA reviewed the merits of this implicit finding and determined it was well supported by the record. *See Cannon I*, 904 P.2d at 96. Like the district court, we conclude that the record belies Cannon's assertion that the Oklahoma court did not consider his arguments regarding the validity of the warrantless search of his home.

Cannon further argues that he was denied a full and fair opportunity to litigate his illegal-search claim because the OCCA improperly denied him the benefit of the state-law rule announced in *Schorr v. State*, 499 P.2d 450 (Okla. Crim. App. 1972). *Cf. Gamble*, 583 F.2d at 1165 (holding that a predicate to the

-17-

applicability of the *Stone* bar is the "recognition and at least colorable application of the correct Fourth Amendment constitutional standards" by the state courts). A review of the OCCA's opinion on direct appeal, however, clearly demonstrates that the OCCA decision constitutes a "colorable" analysis of the state-law rule announced in *Schorr* so as to satisfy the concept announced in *Gamble*. In addressing Cannon's claim based on *Schorr*, the OCCA held as follows:

> Evidence did not show whether Pacheco repeated the *Miranda* warnings before asking Cannon for consent to search. Cannon claims this Court has held that a valid custodial consent to search must be preceded by *Miranda* warnings. He relies on *Schorr v. State*, 499 P.2d 450 (Okl. Cr. 1972), *overruled on other grounds*, *Rowbotham v. State*, 542 P.2d 610 (Okl. Cr. 1975), *judgment vacated and remanded*, 428 U.S. 907 (1976), *modified to life imprisonment*, 554 P.2d 814 (Okl. Cr. 1976). Although nothing specifically overrules this portion of *Schorr*, it is cited only in dissenting or questioning opinions subsequent to *Rowbotham*. Since *Rowbotham* this Court has not held *Miranda* warnings are required before obtaining consent to search. The record here does not show whether Pacheco gave Cannon *Miranda* warnings when discussing the consent form, but Cannon received such warnings on the evening of the 25th when he was taken into custody and booked. Cannon has not alleged that he requested an attorney or invoked his right to silence at that time. Testimony showed that officers did not speak to Cannon between booking and Pacheco's visit. Cannon does not allege that he did not understand his rights vis a vis the consent form.

*Cannon I*, 904 P.2d at 96 n.13. In light of this analysis, this court concludes, as did the district court, that Cannon's arguments regarding *Schorr* are more akin to an attack on the merits of the OCCA decision rather than a charge that the OCCA willfully misapplied constitutional law.

-18-

Finally, Cannon incorporates his arguments with regard to his illegal-arrest claim, *see supra* section III.B.1., asserting that because his arrest was illegal, his consent to the warrantless search obtained while he was in custody on an illegal arrest is necessarily invalid as well. In that regard, he further asserts that because he was denied the opportunity to fully and fairly litigate the illegal arrest claim based on the prosecution's *Brady* violation and ineffective assistance of counsel, he was also necessarily denied the ability to fully and fairly litigate his illegal-search claim. These assertions fail for the reasons set out in rejecting Cannon's *Brady* claim, *see infra* section III.B.4., and in rejecting Cannon's claim of ineffective assistance, *see supra* section III.B.1., at p. 13 n.8 & *infra* III.B.3.

### 3. Ineffective Assistance of Counsel

In his habeas petition, Cannon sought to raise the following three claims of ineffective assistance of trial counsel: (1) counsel was ineffective in failing to challenge the seizure of a gun taken from Cannon's home at the time of his arrest; (2) counsel was ineffective in failing to request a handwriting expert to contest the prosecution's assertion that the signature on the "search waiver" was Cannon's; and (3) counsel was ineffective in not adequately investigating and presenting Cannon's illegal-arrest claim. Although it recognized that Cannon had not raised these claims in state court and that the claims were therefore unexhausted, the district court chose to deny relief on the merits pursuant to 28

U.S.C. § 2254(b)(2). [10] This court, however, denies Cannon relief as to these claims under the doctrine of procedural bar. *See Medlock v. Ward*, 200 F.3d 1314, 1322 (10th Cir. 2000) (denying habeas relief on the basis of procedural bar despite fact that district court had denied relief on the merits pursuant to § 2254(b)(2)).

Except for a few narrow exceptions, § 2254 habeas petitioners must exhaust available state court remedies before seeking habeas relief. *See id.*; *Smallwood v. Gibson*, 191 F.3d 1257, 1267 (10th Cir. 1999); *see also generally* 28 U.S.C. § 2254(b)(1). It is uncontested that Cannon never raised any of his three federal habeas claims of ineffective assistance in state court and has, therefore, failed to exhaust his state court remedies. *See Thomas*, 218 F.3d at 1221. "Nevertheless the Supreme Court has held that if a petitioner 'failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred' the claims are considered exhausted and procedurally defaulted for purposes of federal habeas relief." *Id.* (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). "Oklahoma deems waived

---

[10]Section 2254(b)(2) provides as follows: "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the court of the State." 28 U.S.C. § 2254(b)(2).

claims that were not raised in an initial application for post-conviction relief in a death penalty case." *Medlock* , 200 F.3d at 1323 (citing Okla. Stat. tit. 22, § 1086, 1089(D)(2)); *see also Thomas* , 218 F.3d at 1221 (citing *Medlock* ).

This court may not consider issues raised in a habeas petition "that have been defaulted in state court on an independent and adequate procedural ground[] unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." *English v. Cody* , 146 F.3d 1257, 1259 (10th Cir. 1998). Cannon does not assert that his procedural default is overcome by cause and prejudice or that application of the procedural bar will result in a fundamental miscarriage of justice. Instead, he raises a more fundamental challenge to the Oklahoma procedural bar to claims not raised in an initial petition for post-conviction review: the bar should be disregarded because it does not adequately protect the rights of petitioners to litigate ineffective assistance of trial counsel claims in state court. The problem with this argument, however, is that it is clearly foreclosed by a series of recent Tenth Circuit cases affirming the adequacy of the Oklahoma procedural bar relating to claims not raised in an initial state petition for post-conviction review. *See Thomas* , 218 F.3d at 1221-22; *Medlock* , 200 F.3d at 1323; *Smallwood* , 191 F.3d at 1267-69; *Moore v. Reynolds* , 153 F.3d 1086, 1097 (10th Cir. 1998). In particular, this court in *Medlock* cited to the relevant provisions of the Oklahoma code, Okla. Stat. tit.

22, §§ 1086, 1089(D)(2), and held that "[d]espite the especially vigilant scrutiny we apply in examining procedural bars to ineffective assistance claims, we have held that Oklahoma's procedural bar to claims not raised on initial post-conviction review is independent and adequate." 200 F.3d at 1323. Absent some alteration of the status quo by the OCCA or the Oklahoma legislature, something not alleged by Cannon, this panel is bound by the rule announced by *Thomas*, *Medlock*, *Smallwood*, and *Moore*. *See United States v. Myers*, 200 F.3d 715, 720 (10th Cir. 2000) ("We are bound by the precedent of prior panels absent *en banc* reconsideration or a superseding contrary decision by the Supreme Court." (quotation omitted)); *cf. Strauth v. Nat'l Union Firs Ins. Co. of Pittsburg*, 236 F.3d 1260, 1267 (10th Cir. 2001) (noting special variant of *stare decisis* under which "any panel of this Court [must] follow an earlier panel's interpretation of state law absent a supervening declaration to the contrary by the state's courts or an intervening change in the state law"). Because this court has definitively and repeatedly held that Oklahoma's procedural bar of ineffective assistance claims not raised in an initial state petition for post-conviction relief is independent and adequate, and because Cannon does not argue that his default is excused by cause and prejudice or that the application of the bar would result in a fundamental miscarriage of justice, this court is precluded from reaching the merits of these ineffective assistance of trial counsel claims.

*4.* Brady *Violation*

In his habeas petition, Cannon argued that the prosecution violated *Brady* by failing to disclose prior to trial the misdemeanor arrest warrant, the underlying Application to Revoke Suspended Sentence supporting the warrant, and the District Court Appearance Docket Sheet for Oklahoma County. Cannon argued that these documents were material and exculpatory and that the prosecution's failure to disclose the documents prevented him from adequately litigating his illegal-arrest and warrantless-search claims. In response, Oklahoma asserted that Cannons' *Brady* claim was procedurally barred because Cannon had never raised the claim on direct appeal. [11]

In resolving this claim, the district court agreed that Cannon had never presented his *Brady* claim to the state courts for resolution and that the claim

---

[11]Because Cannon never raised this claim in state court, either on direct appeal or in a petition for post-conviction relief, the claim is technically unexhausted. Nevertheless, if the OCCA would consider the claim procedurally barred based on Cannon's failure to timely raise the claim in state court, the claim is "considered exhausted and procedurally defaulted for purposes of federal habeas relief." *Thomas*, 218 F.3d at 1221 (quotation omitted). Although Oklahoma noted before the district court the dual nature of Cannon's procedural default (*i.e.*, failure to raise the *Brady* claim both on direct appeal and in his state petition for post-conviction relief), its arguments regarding the default focused exclusively on the procedural default rule flowing from Cannon's failure to raise the claim on direct appeal. Because both the parties and the district court focused on the adequacy of this particular procedural default rule, as opposed to the independent procedural default rule discussed in the previous section of this opinion, this court will do likewise in assessing whether Cannon's *Brady* claim is procedurally barred.

would be procedurally barred under Oklahoma law if it were now presented in state court. *See* Okla. Stat. tit. 22, § 1086. The district court concluded, however, that the procedural bar was not adequate to bar federal habeas corpus review because it had not been applied strictly, regularly, or evenhandedly to all similar claims. *See English*, 146 F.3d at 1259 (noting that in order to bar federal habeas corpus review, a state procedural bar must be independent and adequate and holding that "[a]s a general rule, this court has concluded that in order to be adequate, a state rule of procedural default must be applied evenhandedly in the vast majority of cases"). In particular, the district court identified four Oklahoma cases in which the OCCA addressed the merits of a *Brady* claim in a first or subsequent post-conviction proceeding even though the claim was not raised on direct appeal. *See Van Woudenberg v. State*, 942 P.2d 224, 227 (Okla. Crim. App. 1997); *Rojem v. State*, 925 P.2d 70, 73-75 (Okla. Crim. App. 1996); *Munson v. State*, 886 P.2d 999, 1000 (Okla. Crim. App. 1994); *Castleberry v. State*, 590 P.2d 697, 701 (Okla. Crim. App. 1979). In contrast, the district court identified only seven cases during the same time period in which the OCCA refused to address the merits of a *Brady* claim because it was not raised on direct appeal. *See Slaughter v. State*, 969 P.2d 990, 994 (Okla. Crim. App. 1998); *Richie v. State*, 957 P.2d 1192, 1197 (Okla. Crim. App. 1998); *Johnson v. State*, 952 P.2d 1003, 1007 (Okla. Crim. App. 1998); *Scott v. State*, 942 P.2d 755, 758-

59 (Okla. Crim. App. 1997); *Powell v. State*, 935 P.2d 378, 385 (Okla. Crim. App. 1997); *Newsted v. State*, 908 P.2d 1388, 1391-92 (Okla. Crim. App. 1995); *Hale v. State*, 807 P.2d 264, 269 (Okla. Crim. App. 1991). Because, by its count, the OCCA had failed to apply the procedural bar in almost forty percent of relevant cases, the district court concluded that the procedural bar applicable to *Brady* claims not raised on direct appeal was inadequate.

Unfortunately, the district court did not have the benefit of this court's decision in *Hale v. Gibson*, 227 F.3d 1298, 1330 n.15 (10th Cir. 2000) at the time it issued its decision. In *Hale*, this court examined the adequacy of the procedural bar at issue here and "again conclude[d] that section 1086 is an adequate state bar to *Brady* claims raised on post-conviction review that could have been raised on direct appeal." *Id.* In so doing, this court specifically held that two of the cases relied on by the district court in the instant case, *Rojem* and *Castleberry*, did not support a conclusion that the § 1086 procedural bar was not applied in an evenhanded manner. *See id.* In particular, this court noted that, in both *Rojem* and *Castleberry*, the OCCA addressed the *Brady* issue for the first time in a post-conviction proceeding because the claims fell within an exception set out in § 1086 for claims which for sufficient reason were not asserted or were inadequately raised on direct appeal. *See id.* Furthermore, *Hale* identified two additional cases in which the OCCA applied the procedural bar to *Brady* claims

-25-

raised for the first time in state petitions for post-conviction relief. *See id.* (citing *Smith v. State*, 878 P.2d 375, 377 (Okla. Crim. App. 1994) and *Banks v. State*, 810 P.2d 1286, 1289 (Okla. Crim. App. 1991)). [12]

*Hale* thus not only expanded the universe of cases, beyond those identified by the district court, in which the OCCA applied the procedural bar to *Brady* claims not raised on direct appeal, it also rejected as dissimilar two cases relied on by the district court in determining the procedural bar was not regularly applied. *See id.* ("'The test . . . is whether the state courts' actual application of the particular procedural default rule to *all similar claims* has been evenhanded in the vast majority of cases.'" (quoting *Maes v. Thomas*, 46 F.3d 979, 986 (10th Cir. 1995)). Accordingly, the question is whether the two remaining cases identified by the district court in which the OCCA did not apply the procedural bar to a *Brady* claim not raised on direct appeal are sufficient, in light of this expanded universe of cases, to conclude that the procedural bar is inadequate.

In considering one of these two remaining cases, *Munson*, the district court erred in concluding that the OCCA decision supported its view that Oklahoma's procedural bar of *Brady* claims was not adequate. Although there is no

---

[12]We have also identified an additional case in which the OCCA held that a *Brady* claim was not preserved for post-conviction review because the petitioner failed to demonstrate that the claim could not have been presented on direct appeal. *See Brown v. State*, 933 P.2d 316, 324 (Okla. Crim. App. 1997).

discussion of the procedural bar, the *Munson* opinion makes clear that the *Brady* issue could not be adequately raised on direct appeal because much of the material forming the basis of the claim became available only after direct appeal. *See* 886 P.2d at 1002 ("Despite the district court's order and the prosecutor's assurances that the State had complied with [the discovery orders], a significant amount of evidence, including police reports and photographs, was not turned over to Munson either before or during trial. In fact, some of this evidence was not turned over to defense counsel until the post-conviction evidentiary hearing, which was held more than eight years after the original trial."). Accordingly, we conclude that *Munson* is not similar to the case at hand and, therefore, not relevant to the question of whether the Oklahoma procedural bar is adequate.

We agree with the district court that the OCCA's failure to apply the procedural bar in *Van Woudenberg* cannot be explained by reference to the exception in § 1086 for claims that could not be adequately presented on direct appeal. *See* 942 P.2d at 227 (noting that supposedly suppressed exculpatory statements were discussed on the record at trial); *id.* at 229 (Lumpkin, J., concurring in the result) ("The proposition raised in the present case could have been raised and addressed in both the direct appeal and the prior post-conviction application. In fact, as the opinion relates it is revealed in the transcript of the trial. Therefore the issue has been waived."). As the above discussion indicates,

however, the OCCA's failure to apply the procedural bar in *Van Woudenberg* is an aberration.

In *Andrews v. Deland*, this court held that the test of a procedural bar's adequacy is whether the state court's "actual application of the particular procedural default to all similar claims has been evenhanded in the vast majority of cases." 943 F.2d 1162, 1190 (10th Cir. 1991) (quotations omitted). Furthermore, the fact that a state court has overlooked the procedural bar as an "occasional act of grace" is insufficient to conclude that the procedural bar is inadequate. *Id.* (quotation omitted). With this in mind, we conclude that the decision in *Van Woudenberg*, standing alone as it does, is insufficient to demonstrate that Oklahoma's procedural bar to *Brady* claims not raised on direct appeal is inadequate. Accordingly, as we did recently in *Hale*, this court reaffirms that § 1086 is an adequate state bar to *Brady* claims which could have been, but were not, raised on direct appeal. *See Hale*, 227 F.3d at 1330 n.15. Furthermore, even though Cannon did not exhaust his *Brady* claim in state court, we are convinced the OCCA would not dispense "grace" to Cannon as it did in *Van Woudenberg*. Given that Cannon raised on direct appeal the alleged illegality of his arrest based on the misdemeanor and traffic warrants, albeit in the Fourth Amendment context, we have no doubt the OCCA would apply its procedural bar to a *Brady* claim based on the same arguments.

This court may not consider issues raised in a § 2254 habeas petition "that have been defaulted in state court on an independent and adequate procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." *English*, 146 F.3d at 1259. Because Cannon does not assert that a fundamental miscarriage of justice will occur if this court does not address his claim, we examine only whether he has established cause and prejudice for the procedural default. As cause for his procedural default, Cannon asserts that he was not able to bring the claim on direct appeal because the prosecutor failed to turn over the relevant documents prior to the completion of the direct appeal process. In other words, Cannon argues that the prosecutor's violation of *Brady* itself serves as cause for the failure to raise the *Brady* claim on direct appeal.

Although this court does not doubt that a prosecutor's failure to disclose exculpatory materials may in certain circumstances serve as cause for the failure to raise a *Brady* claim in the appropriate state proceeding, *see, e.g.*, *Parkus v. Delo*, 33 F.3d 933, 940 (8th Cir. 1994), this is not one of those cases. As set out above in discussing Cannon's Fourth Amendment claims, the documents at issue here were included in a discovery request filed by Cannon prior to trial. At the suppression hearing held on Cannon's illegal arrest claim, Cannon specifically informed the state trial court that the prosecution had not produced the

documents and once again asked that the documents be produced. In response, the prosecution argued that the trial court could decide the validity of the arrest based solely on the testimony of the arresting officer. The trial court agreed and ruled that the arrest comported with the Fourth Amendment. Accordingly, it was absolutely clear early in the trial process that the prosecution had not produced the documents. Furthermore, as noted by the district court, all three documents were available in an open state court file since 1985, approximately eight years before Cannon's trial. Finally, a copy of the arrest warrant was submitted by the state as a supplemental record on direct appeal and accepted as tendered by the OCCA. *See Cannon I* , 904 P.2d at 95 n.7. Under these circumstances, Cannon's assertion that he could not have discovered the basis of his *Brady* claim prior to the bringing of his direct appeal lacks merit. Because Cannon has not demonstrated cause for his procedural default, this court may not consider the *Brady* issue on the merits. *See Hale* , 227 F.3d at 1330-31.

5. *Jury Instructions*

At trial, the prosecution offered the jury alternative theories upon which it could convict Cannon of malice aforethought murder: (1) Cannon directly committed the murder; or (2) Cannon aided and abetted LaFevers in committing

the murder. [13] In his § 2254 habeas petition, Cannon alleged that the aiding and abetting instructions given at trial impermissibly allowed the jury to convict him of malice aforethought murder without any showing he intended that Ms. Hawley be killed. Because Oklahoma law requires proof of specific intent for a malice murder conviction, [14] Cannon asserts that the alleged instructional error denied him his Fourteenth Amendment right to due process of law. [15]

---

[13]*See Cannon I*, 904 P.2d at 99 ("The State's theory at trial was that Cannon was guilty of malice murder as a principal by aiding and abetting LaFevers (if the jury believed Cannon's statement [made to law enforcement officers after his arrest]) and also as a principal by his own actions.").

[14]*See Cannon I*, 904 P.2d at 99 ("Cannon and the State agree that proof of criminal intent is an essential element for a murder conviction under an aiding and abetting theory."); *see also Torres v. State*, 962 P.2d 3, 16 (Okla. Crim. App. 1998) ("This Court has held that in a malice murder case the State must prove the aider and abettor personally intended the death of the victim and aided and abetted with full knowledge of the intent of the perpetrator." (quotation omitted)).

[15]*See Patterson v. New York*, 432 U.S. 197, 210 (1977) ("[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged."); *see also Jackson v. Virginia*, 443 U.S. 307, 318 (1979) ("[Under our case law] the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilty beyond a reasonable doubt."). In the section of his brief arguing that the jury was misinstructed as to the elements of malice murder, Cannon also cites to and relies upon the Supreme Court's decision in *Tison v. Arizona*, 481 U.S. 137, 156 (1987). This court does not read *Tison* as addressing in any way the question whether Cannon's murder conviction is infirm because the jury was not properly instructed at trial on the elements of malice murder. Instead, as set out more fully *infra*, *Tison* is directed to the question of

(continued...)

-31-

On direct appeal, the OCCA rejected Cannon's claim that the aiding and abetting instructions given at trial permitted the jury to convict Cannon of malice murder without finding that he had the specific intent to kill Ms. Hawley. In so doing, the OCCA held as follows:

> Nobody contests the fact that, under the aiding and abetting theory, the jury had to find that Cannon was a principal to the crime. Instructions 36 and 37 correctly defined "principal" and aiding and abetting. The remaining instructions clearly set forth the defense of abandonment, the burden of proof, and the definition of criminal intent.
>
> Cannon claims that the malice murder instructions told the jury that Cannon must have caused the victim's death and that the aiding and abetting instructions told them Cannon could be guilty if he did not actually commit the acts. He says "it is not a giant leap" to conclude that an aiding and abetting conviction for malice murder required only general intent. On the contrary, this is a leap of epic proportions. The aiding and abetting instructions cannot be read in a vacuum; they explicitly refer to the underlying charged crime and indicate that the elements of the charged offense must be proved. Read as a whole, the instructions clearly required the jury to find that Cannon's conduct caused Hawley's death and that he intended to take her life, or that he aided and abetted LaFevers' acts knowing of and sharing in LaFevers' intent to take Hawley's life. These instructions were not erroneous.

---

[15](...continued)
what level of culpable mental state is required, assuming an otherwise valid murder conviction, in order to satisfy the Eighth Amendment's requirement that the death penalty be proportional to the underlying crime of conviction. *See id.* at 158 ("[W]e simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the [Eighth Amendment's] culpability requirement."). Accordingly, this court considers Cannon's *Tison* arguments *infra*, in that section of the opinion addressing the validity of Cannon's death sentence. *See infra* section III.C.2.

-32-

*Cannon I*, 904 P.2d at 99.

In this case, the state trial court defined aiding and abetting in Instruction 37 as follows:

> One who does not actively commit the offense, but who aids, promotes, or encourages its commission, either by act or counsel or both, is not deemed to be a principal to the crime unless he did what he did *knowingly and with criminal intent*. To aid or abet another in the commission of a crime implies a consciousness of guilt in instigating, encouraging, promoting, or aiding in the commission of that criminal offense.

(emphasis added). Furthermore, the jury instructions defined criminal intent as the "[d]esign to commit a crime or to commit *acts the probable consequences of which are criminal*." (emphasis added). Taken together, Cannon asserts that these instructions allowed the jury to convict him of malice murder without finding that he had the specific intent to take Ms. Hawley's life.[16]

Like the district court, this court concludes that the decision of the OCCA rejecting Cannon's claim of instructional error is neither "contrary to" nor an "unreasonable application of" *Patterson v. New York*, 432 U.S. 197 (1977) and

---

[16]In particular, Cannon asserted as follows in his § 2254 habeas petition:
> The[] [aiding and abetting] instructions, on their face, permit a jury to convict a person of malice aforethought murder if the jury finds the person aided and abetted the perpetrator "knowingly" and with an intent to commit any act the "probable results of which are criminal." Such instructions negate the requirement that an accused must have "malice aforethought" or the "specific intent" to cause death [] before conviction of "malice aforethought" murder.

*Jackson v. Virginia*, 443 U.S. 307 (1979). 28 U.S.C. § 2254(d)(1). Although Cannon would have this court focus very narrowly on a limited number of instructions in determining whether the jury was properly instructed, the Supreme Court has repeatedly cautioned that instructions must be evaluated not in isolation but, instead, in the context of the entire panoply of instructions.[17] In that regard, this court notes that in addition to the two instructions quoted above, the jury was instructed that "malice aforethought" means "a deliberate intention to take away the life of a human being"; that malice aforethought was an element of murder in the first degree[18]; that the State had to prove each element of the charged crime, including the specific intent to kill, beyond a reasonable doubt[19];

---

[17]*See, e.g.*, *Jones v. United States*, 527 U.S. 373, 391 (1999) ("Our decisions repeatedly have cautioned that instructions must be evaluated not in isolation but in the context of the entire charge."); *Bryan v. United States*, 524 U.S. 184, 199 (1998) (holding that instructions that might be ambiguous in the abstract can be cured when read in conjunction with other instructions).

[18]Instruction 18 provides as follows:
No person may be convicted of MURDER IN THE FIRST DEGREE BY MALICE AFORETHOUGHT unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:

| | |
|---|---|
| First, | the death of a human; |
| Second, | the death was unlawful; |
| Third, | the death was caused by the defendant; |
| Fourth, | the death was caused by malice aforethought. |

[19]Instruction 11 provides as follows:
The defendant is presumed innocent of the crime charged, and the presumption continues unless, after consideration of all the
(continued...)

-34-

and, finally, that "[t]he external circumstances surrounding the commission of a homicidal act may be considered in finding whether or not deliberate intent existed in the mind of the defendant to take a human life." Reading these instructions in conjunction with the instructions cited by Cannon, the OCCA concluded that, in order to convict Cannon, the jury was required to "find that Cannon's conduct caused Hawley's death and that he intended to take her life, or that he aided and abetted LaFevers' acts knowing of and sharing in LaFevers' intent to take Hawley's life." *Cannon I*, 904 P.2d at 99. Upon our independent review of all fifty-nine instructions given to the jury in this case, this court concludes that the decision of the OCCA is neither "contrary to" nor "an unreasonable application of" *Patterson* and *Jackson*. 28 U.S.C. § 2254(d)(1).

---

[19](...continued)
evidence, you are convinced of his guilt beyond a reasonable doubt. The State has the burden of presenting the evidence that establishes guilt beyond a reasonable doubt. The defendant must be found not guilty unless the State produced evidence which convinces you beyond a reasonable doubt of each element of the crime.

Instruction 30, the jury instruction relating to Cannon's intoxication defense, provides as follows:

It is the burden of the State to prove beyond a reasonable doubt that the Defendant formed the specific criminal intent of the crime[] of Murder in the First Degree . . . .

If you find that the State has failed to sustain that burden, by reason of the Defendant's intoxication, then the Defendant must be found not guilty of that . . . crime.

## C. Penalty Phase Issues

### 1. Ineffective Assistance of Counsel

Cannon argued in his habeas petition before the district court and reasserts on appeal that he was denied his Sixth Amendment right to effective assistance of counsel when his trial counsel failed to develop and introduce additional mitigation evidence during the penalty phase of the trial. In particular, Cannon identifies the following three areas of mitigation evidence not developed by counsel at trial: (1) evidence of possible organic brain damage; (2) a social history investigation which would have examined Cannon's childhood and early adult life; and (3) DNA testing of blood stains on Cannon's pants. The district court reviewed these claims on the merits and concluded that, even assuming counsel had rendered substandard performance, Cannon had not carried his burden under *Strickland v. Washington*, 466 U.S. 668 (1984) of demonstrating prejudice. Because the OCCA did not address this claim and the district court made its own determination on the merits,[20] this court reviews the district court's

---

[20]Before proceeding to the merits of these particular ineffective assistance claims, the district court recognized that the OCCA had refused to consider the claims on the merits in deciding Cannon's state petition for post-conviction relief. The OCCA concluded that the claims were procedurally defaulted because Cannon failed to raise them on direct appeal. *See Cannon II*, 933 P.2d at 928-29. The district court recognized, however, that this court has been particularly vigilant in analyzing the adequacy of Oklahoma's procedural bar as applied to claims of ineffective assistance not raised on direct appeal. *See generally English*

(continued...)

resolution of Cannon's ineffective assistance claims *de novo* . *See Smith v.*

*Gibson* , 197 F.3d 454, 461 (10th Cir. 1999) (holding that ineffective assistance

claims present mixed questions of law and fact which are reviewed *de novo* ); *see*

*also LaFevers* , 182 F.3d at 711 (holding that, post-AEDPA, when state court did

not review case on merits and "federal district court made its own determination

in the first instance," this court will review the district court's conclusions of law

*de novo* ).

"To establish ineffective assistance of counsel, a petitioner must prove that

counsel's performance was constitutionally deficient and that counsel's deficient

---

[20](...continued)
*v. Cody*, 146 F.3d 1257, 1263-65 & nn. 5-6 (10th Cir. 1998) (discussing at length this particular procedural bar).  The district court thus specifically directed the state to brief whether the particular appellate rule in place at the time of Cannon's direct appeal provided an adequate mechanism for the development of a factual record regarding the adequacy of trial counsel. *See Hooks v. Ward*, 184 F.3d 1206, 1217 (10th Cir. 1999) ("[W]e conclude that the state bears the burden of proving the adequacy of a state procedural bar in order to preclude federal habeas corpus review.").  Despite this direction, the state "wholly failed" to address the adequacy of procedural mechanisms or the OCCA's treatment of the applicable rules of appellate procedure. *See* Dist. Ct. Order at 59 n.35.  Accordingly, having concluded that the state had failed to carry its burden of demonstrating the adequacy of the procedural bar employed by the OCCA in refusing to address the merits of Cannon's claims of ineffective assistance, the district court considered those claims on the merits.

In its brief on appeal, the state reasserts the procedural bar.  Its brief, however, simply refers this court to its inadequate briefing before the district court.  Like the district court, we conclude that the state has failed to carry its burden as set forth in *Hooks* and, therefore, proceed to the merits of Cannon's claims.

-37-

performance prejudiced the defense." *See Wallace v. Ward*, 191 F.3d 1235, 1247 (10th Cir. 1999) (citing *Strickland*, 466 U.S. at 687), *cert. denied*, 530 U.S. 1216 (2000). To carry his burden under *Strickland*'s performance prong, Cannon must "demonstrate his counsel committed serious errors in light of prevailing professional norms such that his legal representation fell below an objective standard of reasonableness." *Cooks v. Ward*, 165 F.3d 1283, 1292 (10th Cir. 1998) (quotations omitted). In so doing, Cannon "must overcome the presumption that counsel's conduct was not constitutionally defective." *Wallace*, 191 F.3d at 1247 (citation omitted). Because this claim of ineffective assistance relates to the validity of his death sentence, Cannon must demonstrate "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death" in order to carry his burden under *Strickland*'s prejudice prong. *Strickland*, 466 U.S. at 695. Taken together, *Strickland*'s performance and prejudice inquiries provide the following benchmark for judging a claim of ineffective assistance: "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. "Courts may address the performance and prejudice components in any order and need not address both if a [petitioner] fails to make a sufficient showing of one." *Hale*, 227 F.3d at 1314.

### a. *Failure to Obtain DNA Testing*

Cannon argues that his trial counsel was ineffective for failing to have DNA testing performed on a pair of pants admitted at his trial. At trial, the prosecution presented to the jury two pairs of blood-stained pants and asserted that one pair was worn by Cannon ("Exhibit 84) and the other by LaFevers ("Exhibit 83") on the night of the murder. In that regard, Joyce Gilchrist, a forensic chemist employed by the Oklahoma City Police Department ("OCPD"), testified that eight blood stains on Exhibit 84, the pants associated with Cannon, were analyzed for blood type. That analysis revealed four stains of type O blood around the cuffs and back of the pants, three type A stains in various locations on the pants, and one stain that was inconclusive as to type on the inside of the lower leg. Gilchrist further testified that both Cannon and the victim had type O blood and that LaFevers had type A blood. Finally, Gilchrist testified that Exhibit 83, the pants associated with LaFevers, had four type O blood stains and four type B stains.

Following Gilchrist's testimony, the prosecution adduced the testimony of Tom Bevill, an employee of the OCPD with an expertise in "geometric blood stain analysis." As to Exhibit 84, Bevill testified that the majority of the blood on the pants constituted transfer blood, *i.e.*, blood that did not drip or splatter from the blood source but instead came from rubbing against a bloody object or

body part, and that there were "very few instances" of medium velocity splatters. Bevill testified that medium velocity blood stains were indicative of force being applied to a bloody surface, such as a physical blow to an already bloodied body part. He further testified that the "majority of the activity as far as medium velocity is going to be very low toward the cuff and primarily to the back side of the pair of jeans." Bevill testified that Exhibit 83 was more heavily stained with blood, including a much larger number of medium velocity blood stains. Based on the testimony of Gilchrist and Bevill, the prosecutor asked the jury to infer that Cannon had directly participated in the beating of the victim before she was set on fire.

In his habeas petition, Cannon argued as follows:

> The blood splatter evidence was the foundation of the state's case to make Randy Cannon an active participant in the murder rather than a person who was merely present as argued by defense counsel at trial. From conversations with defendant, there is no question the blood on the trousers is not the victim's blood . . . . DNA testing would have negat[ed] this portion of the state's case to prove Randy Cannon beat Ms. Hawley numerous times causing blood to splatter on his clothing.

The district court rejected this claim, concluding that Cannon had failed to demonstrate any prejudice flowing from counsel's failure to request DNA testing. In support of this conclusion, the district court noted as follows: (1) evidence Cannon participated in beating Ms. Hawley formed only a small part of the prosecution's case; (2) trial counsel's cross-examination of Bevill was effective in

demonstrating that LaFevers was, based upon the amount and location of the blood on the clothing introduced into evidence, more involved in the beating of the victim than was Cannon; and (3) the blood-splatter evidence was not unduly stressed during closing arguments. Accordingly, the district court concluded that even if the DNA testing conclusively established that the blood on Exhibit 84 was Cannon's and not the victim's, there was no reasonable probability that the jury would have rendered a different verdict.

On appeal, Cannon simply reasserts the arguments he made before the district court and argues that if DNA evidence were admitted during the second stage of his trial at least one juror would have voted for life. Upon *de novo* review, this court agrees with the district court that Cannon has not carried his burden of demonstrating prejudice flowing from trial counsel's failure to obtain DNA testing of Exhibit 84.

This court has closely reviewed the testimony of both Gilchrist and Bevill and concludes, like the district court, that the testimony had no impact on the jury's imposition of the death penalty. We begin by noting that trial counsel was exceedingly effective during cross-examination in eliciting testimony regarding two key defense points: (1) it was a matter of pure speculation whether the type O blood on exhibit 84 was the blood of the victim; and (2) assuming the pants adduced by the prosecution were worn by LaFevers and Cannon on the night of

the murder, and further assuming that the blood on Exhibit 84 came from the victim, the blood splatter evidence demonstrated that LaFevers was far more involved in the beating of the victim.[21] In that regard, this court notes that Gilchrist testified on cross-examination that despite the availability of DNA testing well before trial and the efficacy of such testing on old samples of dried blood, the prosecution had not undertaken to conduct DNA testing on the pants.[22]

---

[21]This court is well aware that subsequent DNA tests on Exhibit 83, the pants allegedly worn by LaFevers, demonstrated that the blood on those pants came from Cannon rather than the victim. *See LaFevers v. Gibson*, 238 F.3d 1263, 1266 (10th Cir. 2001). This does not alter the fact that the testimony at Cannon's trial focused on LaFevers as the primary actor in the beating of the victim.

[22]This court recognizes that recently information has come to light casting serious doubt on the veracity of Gilchrist's testimony in a large number of criminal prosecutions. *See generally* CBS News/60 Minutes II, *Under the Microscope*, (May 9, 2001) http://www.cbsnews.com/now/story/0,1597,290046-412,00.shtml (noting that Gilchrist is the "target of several investigations," including an FBI investigation and noting that "there are growing concerns that she may have put people in prison with more sorcery than science"). In fact, there is serious reason to doubt the veracity of Gilchrist's testimony in this particular case. *See LaFevers*, 238 F.3d at 1266 (recounting evidence supporting assertion that Gilchrist lied during LaFevers' trial as to whether electrophoresis testing had been conducted on Exhibit 83, the pants attributed to LaFevers, prior to trial). In light of this new information, Cannon has presented this court with a "Request to Hold Appeal in Abeyance Pending DNA Testing" (the "Request"). In the Request, Cannon avers that funding has become available to conduct DNA testing on Exhibit 84 and reasserts the arguments set forth in this brief with regard to the alleged important role Exhibit 84 played in his trial. This court is sympathetic to Cannon's concerns regarding the possibility that Gilchrist testified falsely during his trial. Nevertheless, as noted at some length below, this court is firmly convinced that even factoring the blood-splatter evidence out of the equation, there does not exist a reasonable probability that the result of the

(continued...)

Bevill's testimony regarding the blood on the pants is best described as equivocal. For instance, he testified that the pants appeared to be work pants, that he could not say when the blood stains were deposited on the pants, and that he could not link up the small number of medium velocity blood splatters on the pants with the murder of Ms. Hawley. He also testified that the pants and other clothing associated with LaFevers were far more likely to have been near a violent scene. As to Exhibit 84, Bevill testified that the person wearing those pants "would be at more of a distance [from the victim during the beating] than the person wearing [Exhibit 83]" and that, based on the pattern of the medium velocity blood splatters, might have had his back turned to the scene. Based upon this testimony, the jury was specifically instructed during the penalty phase that Cannon had presented evidence "as to the following mitigating circumstances: 1. Randall Cannon played a lesser role in the death of Addie Hawkins."

In addition to the equivocal nature of the testimony of Gilchrist and Bevill, we note that, considered in context of all of the evidence presented at trial, the blood splatter evidence did not play a particularly significant part in the

_____

[22](...continued)
penalty phase would have been different. Accordingly, even if the anticipated DNA testing demonstrated that the blood on Exhibit 84 did not belong to the victim, this court's disposition of Cannon's habeas petition would not change. For this reason alone, while recognizing serious questions exist regarding Gilchrist's testimony, Cannon's Request to abate is hereby **DENIED**.

-43-

proceedings. Although the prosecution did ask the jury to infer from the presence of the medium velocity blood splatters on the cuffs and back of Exhibit 84 that Cannon had participated in beating the victim, that evidence was not unduly emphasized during its closing arguments. Furthermore, in considering the likely impact of the prosecutor's closing arguments, this court will not disconnect those comments from the actual evidence presented at trial, evidence that was, as noted above, equivocal. In that regard, we note that the jurors were specifically instructed that it was their responsibility "to determine the facts from the evidence" and that "[n]o statement or argument of the attorneys is evidence." Considered in context of all of the evidence presented at trial, we conclude that Cannon has not carried his burden of demonstrating a reasonable possibility that the result of the penalty phase would have been different if his counsel had DNA tests conducted on Exhibit 84 and those test revealed the blood did not come from the victim.

Our conclusion in this regard is bolstered by the fact that the prosecution presented evidence of Cannon's participation in the other key aspects of the criminal episode leading up to the death, including the dousing of Ms. Hawley with gasoline and setting her on fire. *See Cannon I*, 904 P.2d at 100-02 (setting

forth evidence).[23]  This court has previously described the facts surrounding the murder of Ms. Hawley as "particularly vile." *LaFevers v. Gibson*, 238 F.3d 1263, 1268 (10th Cir. 2001).  Furthermore, the prosecution's case during the penalty phase was exceedingly strong and the jury found the existence of all three aggravating circumstances presented to it.  We simply do not think, upon review of the entire record in this case, that removing Exhibit 84 from the equation alters the balance struck by the jury between the aggravating and mitigating evidence, even considering the additional mitigation evidence discussed below which Cannon claims counsel was ineffective for failing to present at trial.  *See Williams v. Taylor*, 120 S. Ct. 1495, 1515 (2000) (holding that in evaluating a claim of ineffective assistance of counsel premised on alleged failure to adduce mitigation evidence courts must "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas

---

[23]Furthermore, even Cannon's own confession, a self-serving confession that consistently assigns primary blame to LaFevers, demonstrates that Cannon was well aware LaFevers intended to murder Ms. Hawley and that Cannon took actions to aid LaFevers in that purpose.  For instance, Cannon stated that as he and LaFevers began to drive away from Ms. Hawley's house, she fell from the car.  *See Cannon I*, 904 P.2d at 101.  Cannon returned to the scene at LaFevers' direction because LaFevers said "she say us." *Id.*  "Cannon drove off with LaFevers in the front [of the car] and [Ms. Hawley] screaming 'don't do it' in the back seat.  LaFevers said they 'had to get rid of her.'" *Id.*  Thereafter, Cannon drove to a gas station to obtain gasoline; drove to a deserted location; watched LaFevers drag Ms. Hawley into a field, pour gasoline over her, and set her on fire; he then watched with LaFevers as Ms. Hawley burned.  *See id.*

proceeding—in reweighing it against the evidence in aggravation"); *see also*

*Walker v. Gibson*, 228 F.3d 1217, 1234 (10th Cir. 2000) (holding that in

determining whether petitioner was prejudiced by counsel's failure to present

additional mitigation evidence, this court considers the strength of the state's

case, the aggravating circumstances the jury found, the mitigation evidence

defense counsel did present, and the additional mitigation evidence defense

counsel might have presented).

> b. *Failure to develop additional mitigation evidence relating to brain damage and social history*

Cannon argued in his habeas petition that his trial counsel was ineffective

in failing to develop the following two strands of mitigation evidence at trial:

(1) Cannon suffered from brain damage and a resulting mental disorder which

"prevented him from using appropriate judgment in the incident which caused the

victim's death"; and (2) a developmental social history demonstrating links

between that history and Cannon's conduct at the time of the offense. The district

court denied relief, finding that, without regard to whether trial counsel had

rendered constitutionally deficient performance, Cannon had failed to demonstrate

that he was prejudiced by trial counsel's failure to adduce these additional strands

of mitigation evidence. In so concluding, the district court noted that in an

affidavit submitted by Cannon, the expert had opined that the result of the penalty

phase would have likely been different if the additional evidence had been

presented to the jury. The district court held, however, that this opinion was not supported by objective facts. Instead, after a thorough review of the entire trial transcript and the exhibits submitted by Cannon, the district court concluded that there was no reasonable probability that the jury would have returned a verdict less than death had the additional mitigation evidence been introduced. In particular, the district court identified the brutal nature of the murder and the strength of the other evidence supporting the aggravating factors found by the jury.

This court reviews *de novo* the district court's conclusion that Cannon was not prejudiced by his counsel's failure to adduce evidence relating to the two additional strands of mitigation evidence. *See Smith*, 197 F.3d at 461. In assessing the question of prejudice, we evaluate the totality of the available mitigation evidence, both that presented at trial and that identified on habeas review, and weigh it against the strength of the state's case and the aggravating circumstances found by the jury. *See Williams*, 120 S. Ct. at 1515; *Walker*, 228 F.3d at 1234.

We begin by noting that trial counsel presented substantial mitigation evidence at trial relating to Cannon's exemplary work history; lengthy history of acts of kindness to the elderly, disabled, and destitute; strong, continuing attachment to his young daughter, despite the fact of his continued incarceration;

lack of a criminal record before the murder; relatively less culpable role in the murder; and exemplary behavior as a prisoner over the previous eight years. Read holistically, trial counsel's mitigation evidence painted Cannon as a kind, compliant, and responsible individual whose involvement in the murder was an aberration.

The omitted mitigation evidence identified in Cannon's petition comes in the form of affidavits from a clinical psychologist, a Licensed Clinical Social Worker, and a professor of neurology and pharmacology. Taken together, these affidavits indicate that Cannon suffers from serious brain damage and resulting psychiatric disorders which "distort his perceptions and impair his judgment." The psychiatric disorders flow from organic damage, head trauma, and prolonged alcoholism and drug abuse. The head trauma originated from an incident in which Cannon was hit in the head with a police officer's flashlight.

Cannon asserts on appeal that absent the omitted mitigation evidence an incomplete picture was provided to the jury resulting in its decision to impose the death sentence. In particular, Cannon asserts that the neuropsychological evidence and the social history background could have "explained to the jury how [Cannon] came to participate in this crime and why they should spare his life." This court's review of the omitted evidence, however, leads us to conclude that the evidence is far less beneficial than asserted by Cannon. In particular, the

omitted evidence tends to depict Cannon as an unstable individual with very little impulse control. This evidence would have negated much of the mitigation evidence actually adduced by trial counsel and could have strengthened the prosecution's argument that Cannon represented a continuing threat to society. *See Davis v. Executive Dir. of Dept. of Corr.*, 100 F.3d 750, 762 (10th Cir. 1996) (holding that court must carefully review omitted mitigation evidence to determine if it is truly mitigating or, instead, has the possibility of being a "two-edged sword" (quotation omitted)). Furthermore, like the district court, we conclude that the state presented a strong case during the penalty phase as to each of the three aggravating circumstances submitted to the jury and that the murder was particularly brutal. In light of the prosecution's strong case and our conclusion that the omitted mitigation evidence would have displaced rather than supplemented the mitigation evidence actually adduced at trial, we conclude that Cannon has failed to carry his burden of demonstrating prejudice under *Strickland*.

2. *Imposition of Death Penalty in Violation of* Enmund *and* Tison

Cannon asserts that he was sentenced to death without the jury making the individualized culpability findings necessary to render that sentence constitutional

under *Enmund* and *Tison*.[24]  The viability of this claim is entirely dependent upon

Cannon's assertion that the jury instructions given in this case permitted the jury

to convict him of malice aforethought murder without finding beyond a

reasonable doubt that he intended the victim die.[25]  Because this court has already

rejected Cannon's claim that the jury was not properly instructed during the guilt

---

[24]In *Enmund v. Florida*, the Supreme Court reversed the death sentence of a defendant convicted under Florida's felony-murder rule.  *See* 458 U.S. 782, 788 (1982).  In so doing, the Court rejected as inconsistent with the Eighth Amendment the Florida rule that allowed for the imposition of the death penalty for felony murder in its most simple form.  *See id.* at 797 ("[I]t is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty on one such as Enmund who aids and abets a felony in the course of which a murder is committed by another but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.  We have concluded, along with most legislatures and juries, that it does not.").  In *Tison v. Arizona*, the Court faced the following question left unanswered in *Enmund*: "The issue raised by this case is whether the Eighth Amendment prohibits the death penalty in the intermediate case of the defendant whose participation [in the felony that ultimately resulted in the murder] is major and whose mental state is one of reckless indifference to the value of human life." 481 U.S. 137, 152 (1987).  The Court ultimately answered the question in the negative, remanding to the Arizona court to determine whether the defendants had the requisite state of reckless indifference.  *See id*. at 158.  Taken together, *Enmund* and *Tison* "require that the jury give individualized consideration to the culpability of defendants prior to imposing the death penalty." *Fowler v. Ward*, 200 F.3d 1302, 1309 (10th Cir.), *cert. denied*, 121 S. Ct. 317 (2000).  They also make clear that the Eighth Amendment does not prohibit the execution of a defendant convicted of felony murder who is a major participant in the felony giving rise to the murder and who acted with a sufficiently culpable mental state.

[25]*See* Appellant's Brief at 87 ("Had the jury been properly instructed they were required to find Mr. Cannon personally had 'malice aforethought' before finding him guilty, this issue would not be in question.  However, if they were not properly instructed in the first stage, [there] would be an *Enmund* violation in the second stage . . . .").

phase of the trial, *see supra* section III.B.5., Cannon's claim based on *Enmund* and *Tison* necessarily fails.[26]

### 3. Removal of Prospective Juror for Cause

The Due Process Clause of the Fourteenth Amendment and the Sixth Amendment's guarantee of an impartial jury, operating together, prohibit the imposition of the death penalty "if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 521-22 (1968). Instead, "a prospective juror may be excluded for cause because of his or her views on capital punishment" only if those views "would prevent or substantially

---

[26]In resolving Cannon's *Enmund/Tison* claim, both the OCCA and the district court expressed doubt as to whether those cases were even applicable given the context of this case. *See Cannon I*, 904 P.2d at 104-05 ("Cannon admits that *Enmund* and *Tison* concern felony murder prosecutions where each defendant may have a different intent and degree of participation in the crime, and acknowledges that he, Cannon, was convicted of malice murder. He nevertheless says that the *Enmund/Tison* principles should apply in malice murder cases where the State presents an aiding and abetting theory. Cannon makes no coherent argument to support this statement."); Dist. Court Order at 69 n.41 ("While Petitioner asserts that the *Enmund* and *Tison* principles applicable to felony murder prosecutions should 'apply under the facts of this case,' Petitioner does not cite any legal authority for his claim."). In light of this court's conclusion that the jury instructions given during the guilt phase did not permit a finding of guilt without finding proof beyond a reasonable doubt that Cannon specifically intended the victim's death or that he aided and abetted LaFevers knowing LaFevers intended the victim's death, *see supra* section III.B.5., this court need not address that question.

impair the performance of his duties as a juror in accordance with his instructions and oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quotation omitted). Cannon asserted in his § 2254 habeas petition that he was denied the impartial jury mandated by *Witherspoon* and *Wainwright* when the state trial judge excluded prospective juror Jack Vann for cause.[27]  In particular, Cannon argues that Vann's responses during *voir dire* indicated that he would consider imposing the death penalty in an appropriate case despite his personal reservations about the death penalty generally.

The OCCA considered and rejected this claim on the merits on direct appeal, holding as follows:

> Cannon . . . argues that prospective juror Vann was improperly excused for cause.  Cannon's right to an impartial jury prohibits the exclusion of venire members who voice general objections to the death penalty or express scruples against its imposition.  The relevant question is whether the juror's views could prevent or substantially impair the performance of his duties as a juror in accordance with the instructions and his oath. . . .
> Cannon argues that Vann was improperly excused because he said he was not opposed to the death penalty and in the right case would consider imposing it.  A thorough reading of the transcript shows that Vann did not understand what was being asked.  Initially he said he was not personally opposed to the death penalty but could not consider imposing it as a juror.  Later he agreed he would have preconceived notions of appropriate punishment but admitted he did not know what that phrase meant; that he could consider all

---

[27]*Cf. Davis v. Georgia*, 429 U.S. 122, 123 (1976) (holding that the exclusion of a single potential juror in violation of the principles set forth in *Witherspoon* means that "any subsequently imposed death penalty cannot stand").

punishments but his mind was closed; and that he didn't believe in the death penalty. . . . The record clearly reflects that Vann did not believe in and would not impose the death penalty, and his excusal for cause was not an abuse of discretion.

*Cannon I*, 904 P.2d at 96-97 (footnotes omitted).

The Supreme Court has made clear that the *Witherspoon/Wainwright* "standard . . . does not require that a juror's bias be proved with 'unmistakable clarity.'" *Id.* Instead, in situations where the printed record lacks clarity, "deference must be paid to the trial judge who sees and hears the jurors" as "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id.* at 425-26. The trial judge's finding as to whether a potential juror is biased is a finding of fact[28] which is presumed correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. 2254(e)(1).

After conducting a lengthy *voir dire*, wherein the prosecution, defense counsel, and trial court all questioned Vann, the trial court dismissed Vann for

---

[28]*See Wainwright v. Witt*, 469 U.S. 412, 428 (1985) ("[T]he question whether a venireman is biased has traditionally been determined through *voir dire* culminating in a finding by the trial judge concerning the venireman's state of mind. . . . [S]uch a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province."); *id.* at 429 ("The trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose bases cannot be easily discerned from an appellate record. These are the 'factual issues' that are subject to [heightened deference on habeas review].").

-53-

cause. In so doing, the trial court concluded as follows: "The Court is convinced that Mr. Vann cannot properly serve on this jury." In both his habeas petition before the district court and brief before this court on appeal, Cannon cites primarily to responses Vann provided to defense counsel during *voir dire* and asserts that those responses "clearly and unequivocally" demonstrate that Vann would consider imposing the death penalty in an appropriate case. Like the district court, however, this court concludes that the transcript of *voir dire*, considered as a whole, supports the trial court's decision to exclude Vann for cause.[29]

During initial questioning by the prosecution, Vann unequivocally indicated that although he was not opposed to the death penalty *per se*, he could not personally vote to impose that ultimate penalty. Defense counsel attempted to rehabilitate Vann as a potential juror during his portion of *voir dire*. As accurately noted by Cannon, Vann does appear to have retreated, during defense counsel's *voir dire*, from his earlier unequivocal statements regarding his unwillingness to impose the death penalty. In light of this apparent change of heart, the trial court conducted its own *voir dire* of Vann. The initial part of the

_____

[29]This court notes that the entire text of the *voir dire* of Vann is set forth in the district court's order denying Cannon's habeas petition. We find it unnecessary to quote the entirety of that lengthy transcript a second time. Nevertheless, this court has closely reviewed the entire transcript of Vann's *voir dire* in deciding this issue.

exchange between Vann and the trial court is best characterized as confused. Although Vann did state at various times during the initial part of the trial court's *voir dire* that he could consider the death penalty as a possible punishment, it is clear that the trial court thought Vann's responses were hesitant and unclear. Apparently feeling that Vann was embarrassed by the personal nature of these questions, the trial court called Vann to the bench and asked him a series of questions outside of the hearing of the other potential jurors. At this time, Vann once again unequivocally expressed that he could not personally sentence a person to death.

The trial court's finding that Vann could not properly serve on the jury is well-supported by the record as a whole. *See* 28 U.S.C. § 2254(d)(2), (e)(1). Furthermore, in reviewing Cannon's *Witherspoon* claim on direct appeal, the OCCA applied the controlling Supreme Court precedent (*i.e.*, *Witherspoon* and *Wainwright*) and concluded that Cannon was not entitled to relief. *See id.* § 2254(d)(1). Because Cannon has failed to demonstrate by clear and convincing evidence that the trial court's factual finding was incorrect, and because the decision of the OCCA is not an unreasonable application of Supreme Court precedent, Cannon is not entitled to habeas relief.[30]

_____

[30]Recognizing the healthy deference that must be afforded a state court finding of fact under 28 U.S.C. § 2254(d)(2) and (e)(1), Cannon asserts that this

(continued...)

# IV. CONCLUSION

For the reasons set out above, the order of the United States District Court for the Western District of Oklahoma denying Cannon's § 2254 habeas petition is hereby **AFFIRMED**.

---

[30](...continued)
court should review the question of Vann's bias *de novo* because that trial court did not make a specific enough finding on that question. As aptly noted by the district court in rejecting this same claim, Cannon's assertion runs directly contrary to Supreme Court's precedent. In *Wainwright*, the petitioner asserted that the trial court's simple command, given in response to the prosecution's challenge for cause, that the potential juror "step down" was not a sufficient finding of fact entitled to deference of federal habeas review. *See* 469 U.S. at 430. In rejecting the claim, the Court held as follows:

> We decline to require the judge to write out in a separate memorandum his specific findings on each juror excused. A trial judge's job is difficult enough without senseless make-work. Nor do we think under the circumstances that the judge was required to announce for the record his conclusion that [the juror in question] was biased, or his reasoning. The finding is evident from the record.

*Id.*