2004 OK 47

Joyce A. GILCHRIST, Plaintiff–Appellant,

v.

BOARD OF REVIEW OF THE OKLAHOMA EMPLOYMENT SECURITY Commission, The Oklahoma Security Commission, and The City of Oklahoma City, Defendants–Appellees.

No. 98,495.

Supreme Court of Oklahoma.

June 15, 2004.

Melvin C. Hall, Riggs, Abney, Neal, Turpin, Orbison & Lewis, Oklahoma City, OK, for Plaintiff–Appellant.

Richard Smith, Assistant Municipal Counselor, Oklahoma City, OK, for Defendant–Appellee, City of Oklahoma City.

Teresa Thomas Keller, Oklahoma City, OK, for Defendant–Appellee, Oklahoma Employment Securities Commission.

WATT, C.J.

## FACTS AND PROCEDURAL BACKGROUND

¶1 Appellant, Joyce Gilchrist, worked for the City of Oklahoma City Police Department as a forensic chemist for many years. Gilchrist was responsible for collecting and analyzing evidence from crime scenes and testifying as to the results in criminal prosecutions. Gilchrist was fired in 2001, in part based on United States District Judge Ralph Thompson's published opinion in a *habeas corpus* proceeding, *Mitchell v. Ward,* 150 F.Supp 2d 1194 (W.D.Okla.1999). The issues before Judge Thompson arose from a criminal matter tried in the District Court of Oklahoma County in which Gilchrist had testified for the prosecution. Based on his analysis of the evidence developed in the *habeas corpus* matter, Judge Thompson concluded that Gilchrist's testimony in the criminal trial concerning DNA evidence had been, "without question untrue," 150 F.Supp.2d at 1226, and "terribly misleading, if not false," 150 F.Supp.2d at 1229.

¶2 Judge Thompson's opinion in *Mitchell* reveals that the petitioner, Mitchell, had been tried and convicted of forcible rape and murder. Mitchell's *habeas corpus* proceeding was based on his claim that he had been denied access to exculpatory evidence. As a result of the seriousness of Mitchell's claims, Judge Thompson allowed Mitchell to conduct discovery, which produced Gilchrist's notes regarding her conversations with an FBI chemist regarding the DNA testing by the FBI.

¶3 Judge Thompson then granted Mitchell an evidentiary hearing. Gilchrist had testified at the criminal trial that the FBI's DNA analysis was "inconclusive" as to whether any DNA sample may have matched Mitchell's DNA. But the FBI chemist testified in the federal *habeas corpus* hearing that Mitchell's DNA was not found in the FBI testing and that was the import of his report to Gilchrist. Gilchrist admitted in the federal court hearing that the DNA evidence did, indeed, exclude Mitchell. It was as a result of these revelations that Judge Thompson concluded that Gilchrist's trial testimony, to the effect that the DNA results were "inconclusive," was untrue. On appeal from Judge Thompson's ruling the United States Court of Appeals for the 10th Circuit summarized the effect of Gilchrist's testimony: *"Ms. Gilchrist thus provided the jury with evidence implicating Mr. Mitchell in the sexual assault of the victim which she knew was rendered false and misleading by evidence withheld*

*from the defense."* [Emphasis by the court.] *Mitchell v. Gibson,* 262 F.3d 1036, 1064 (10th Cir.2001).

¶4 Immediately after Oklahoma City police department officials received a copy of Judge Thompson's opinion in *Mitchell* in the Fall of 1999, they began an investigation into Gilchrist's conduct. Although Gilchrist complains that excessive time elapsed from the time of her testimony against Mitchell in 1992 and the hearing, the record reflects that it was Judge Thompson's 1999 opinion that brought to light the seriousness of Gilchrist's misconduct and the police department investigation started immediately thereafter. Following its investigation the police department started disciplinary proceedings before the Police Department Review Board. These proceedings were significantly delayed as a result of Gilchrist's having sought continuances and having filed a federal court lawsuit to prohibit the city from conducting the hearing. Finally, the Police Department Review Board, after fourteen days of hearings and deliberations ending September 12, 2001, terminated Gilchrist's employment on September 25, 2001.

¶5 Gilchrist filed a claim with the Oklahoma Employment Securities Commission seeking unemployment benefits; On October 15, 2001 the Oklahoma Employment Securities Commission denied Gilchrist's claim based on the Commission's conclusion that Gilchrist had been fired for misconduct. On October 25, 2001, Gilchrist appealed to an Appeal Tribunal of the Oklahoma Employment Securities Commission. On December 12, 2001 a hearing was held before an Appeal Tribunal hearing officer, who affirmed the Commission's determination on February 4, 2002. Gilchrist appealed from the Appeal Tribunal's order and on April 26, 2002 the Oklahoma Employment Securities Commission Board of Review affirmed. Gilchrist filed her petition for judicial review in the District Court of Oklahoma County on May 7,2002. The trial court affirmed the opinion of the Board of Review on October 29, 2002 and this appeal ensued.

## STANDARD OF REVIEW

¶6 Title 40 O.S.2001 § 2–610 provides, "... In any proceeding under this section the findings of the Board of Review as to the facts, if supported by evidence, shall be conclusive and the jurisdiction of said court shall be confined to questions of law...." This Court's standard of review on appeal is the same as that of the trial court. Further, the question of what constitutes "misconduct" sufficient to deprive a terminated employee of entitlement to unemployment benefits is a question of law. *Nordam v. Oklahoma Employment Securities Commission,* 1996 OK 110, ¶12, 925 P.2d 556, 559.

## DISCUSSION

¶7 Title 40 O.S.2001 § 2–406 provides that an individual shall be disqualified from receiving unemployment benefits if the employee was discharged for "misconduct." [1] We have defined "misconduct," as that word is used in § 2–406, to be:

> ... conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or *to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer.* On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good faith errors in judgment or discretion are not to be deemed "misconduct" within the meaning of the statute.

---

1. Title 40 O.S.2001 § 2–406 provides:

An individual shall be disqualified for benefits if he has been discharged for misconduct connected with his last work, if so found by the Commission. Disqualification under this section shall continue for the full period of unemployment next ensuing after he has been discharged for misconduct connected with his work and until such individual has become reemployed and has earned wages equal to or in excess of ten (10) times his weekly benefit amount

[Emphasis added.] *Vester v. Board of Review of Oklahoma Employment Securities Commission,* 1985 OK 21, ¶ 15, 697 P.2d 533, 538.

¶ 8 In addition to Judge Thompson's and the 10th Circuit's *Mitchell* opinions, the record in the trial court contains the Court of Criminal Appeals's opinion in *McCarty v. State,* 1988 OK CR 271, 765 P.2d 1215, which similarly found fault with Gilchrist's conduct. The record also contains other opinions that criticized Gilchrist's conduct in other criminal prosecutions.[2]

¶ 9 We hold that Gilchrist's conduct in *Mitchell,* that is knowingly giving false and misleading testimony in a criminal case, constituted "misconduct" sufficient to support the denial of unemployment benefits under § 2–406, as defined in *Vester,* 1985 OK 21, ¶ 15, 697 P.2d 533, 538. Nothing could be more fundamental than the obligation of a forensic chemist employed by a police department to give testimony that is both honest and fair. Only in this way can our criminal justice system itself be regarded as both honest and fair. Clearly, Gilchrist did not satisfy that standard when she testified in *Mitchell* that the DNA evidence was "inconclusive," despite having been told by the FBI chemist that the DNA was *not* Mitchell's."

¶ 10 The *McCarty* opinion also reveals "misconduct," as found by the Appeal Tribunal, the Board of Review, and affirmed by the trial court. Gilchrist had testified in a murder trial that forensic techniques were not sufficiently advanced to allow positive identification of a person through blood typing, secretor status, or hair analysis. The Court of Criminal Appeals, though, held, *"We find it inconceivable why Ms. Gilchrist would give such an improper opinion, which she admitted she was not qualified to give."* *McCarty,* 1988 OK CR 271 at ¶ 6, 765 P.2d 1215. [Emphasis added.] The court went on to observe, "Whether or not Ms. Gilchrist's opinion constituted an improper personal expression of the appellant's guilt, *her opinion that appellant was in fact present when violence was done to the victim was an improper expert opinion, because it was beyond the present state of the art of forensic science, and certainly beyond Gilchrist's personal knowledge,* as testified to by both Ms. Gilchrist and Mr. Wilson." *McCarty,* 1988 OK CR 271 at ¶ 8, 765 P.2d 1215. [Emphasis added.] As noted, such testimony brings into question the honesty and fairness of the criminal justice system.

¶ 11 We hold that Gilchrist's derelictions "show[ed] an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to [her] employer." *Vester,* 1985 OK 21, at ¶ 15, 697 P.2d 533. Her conduct, therefore, was "misconduct," as that word is used in 40 O.S.2001 § 2–406.

*Gilchrist had no constitutionally protected right to free speech sufficient to protect her from the consequences of her testimony in the Mitchell or McCarty prosecutions.*

■ ¶ 12 Gilchrist cites several opinions, which she claims support her contention that her constitutionally protected right to free speech was violated because she was fired as a result of her testimony in criminal prosecutions.[3] We have found nothing in the cases Gilchrist cites, though, which would convince us that her constitutional rights were violated here. In most of those cases persons who had been accused of crimes sued parties who had been witnesses for the prosecution for money damages on the ground that those defendants' testimony had deprived the convicted plaintiffs of their civil rights. Further, in none of those opinions was the testimony at issue judicially determined to have been false or misleading.

¶ 13 In stark contrast to any of the cases Gilchrist cites, the record of the testimony in the cases at issue here was carefully considered in post-trial proceedings by courts not

---

2. Those opinions are: *McCarty v. State,* 1995 OK CR 48, 904 P.2d 110; *Cannon v. Gibson,* 259 F.3d 1253 (10th Cir.2001); *Pierce v. State,* 1990 OK CR 7, 786 P.2d 1255; *Ables v. State,* OK CR F–1986–776 (unpublished); and *Fox v. State,* 1989 OK CR 51, 779 P.2d 562.

3. In support of this proposition Gilchrist cites, among other opinions. *Williams v. Hepting,* 844 F.2d 138, 141 (3d Cir.1988); *Worrell v. Henry,* 219 F.3d 1197, 1204 (10th Cir.2000); and *Briscoe v. LaHue,* 460 U.S. 325, 330–331, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

involved in the trials themselves. Those courts found that Gilchrist's testimony was either false and misleading or wilfully improper in other ways. On this record, we hold that Gilchrist's rights to free speech were not violated.

## CONCLUSION

¶ 14 The record supports the unanimous holding of the Oklahoma Employment Securities Commission, the Appeal Tribunal, the Board of Review, and the trial court that Gilchrist was guilty of "misconduct" in Gilchrist's job performance, as that word is used in 40 O.S. § 2–406 and was interpreted in *Vester v. Board of Review of Oklahoma Employment Securities Commission*, 1985 OK 21, ¶ 15, 697 P.2d 533, 538. Gilchrist's testimony in the criminal prosecutions described in *Mitchell v. Ward*, 150 F.Supp.2d 1194 (W.D.Okla.1999); *Mitchell v. Gibson*, 262 F.3d 1036 (10th Cir.2001); and *McCarty v. State*, 1988 OK CR 271, 765 P.2d 1215, amply supports the holding. By testifying as she did in those cases, Gilchrist violated her fundamental obligation as a forensic chemist for the Oklahoma City Police Department to give testimony that was both honest and fair. Gilchrist's derelictions "show[ed] an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to [her] employer." *Vester*, 1985 OK 21, at ¶ 15, 697 P.2d 533. Her conduct, therefore, was "misconduct," as that word is used in 40 O.S.2001 § 2–406. Our holding serves to protect the integrity of the criminal justice system by demonstrating that giving false or unfair testimony in criminal prosecutions has consequences.

¶ 15 Gilchrist's civil right to free speech did not serve to insulate her from the consequences of her testimony in the criminal prosecutions at issue here. Her testimony was judicially determined to have been either false and misleading or improper in other ways. Thus, the opinions cited by Gilchrist,

see note 3, are inapposite because in none of them had the defendant's testimony been judicially determined to have been false, misleading, or improper in some other way.

## JUDGMENT OF THE TRIAL COURT AFFIRMED.

ALL JUSTICES CONCUR.

OPALA, V.C.J., concurring.

¶ 1 The court affirms the denial of unemployment benefits to plaintiff Gilchrist on the grounds that (a) her conduct as a forensic chemist in several criminal prosecutions[1] constitutes a § 2–406[2] "misconduct" as that term has been construed by extant jurisprudence[3] and (b) her First Amendment right to speak freely does not insulate her from the adverse consequences of her testimonial misconduct.

¶ 2 I concur in today's decision and in the court's pronouncement. I write separately (a) to explain why Gilchrist cannot interpose here her immunity from civil liability as a criminal prosecution witness to prevent the imposition of adverse collateral consequences of her testimonial conduct upon her claim to unemployment benefits and (b) to focus on her argument that judicial denial of governmental benefits was predicated upon a constitutionally impermissible condition.

### I

**PLAINTIFF APPEARS TO ARGUE THAT HER COMMON–LAW IMMUNITY AS A WITNESS PROTECTS HER FROM GOVERNMENT USE OF HER TESTIMONY TO SHOW MISCONDUCT**

¶ 3 Gilchrist appears to rely on and invoke the common-law rule that shields witnesses from civil liability for any harm occasioned

---

1.  For the criminal cases in controversy, *see infra* note 14.

2.  The pertinent terms of 40 O.S.2001 § 2–406 provide:

    An individual shall be disqualified for benefits if he has been discharged for **misconduct** con-

nected with his last work, if so found by the Commission.....
(emphasis added).

3.  *Vester v. Board of Review of Oklahoma Employment Security Commission*, 1985 OK 21, ¶ 15, 697 P.2d 533, 538.

by testimony given in court proceedings. She claims there is no record support for the judicial analyses in certain state and federal criminal cases[4] to show her testimony to have been improper, inaccurate or misleading. According to Gilchrist, the denial of unemployment benefits rests on a mere disagreement with the content of her testimony.

¶ 4 Assuming Gilchrist is not guilty of perjury and taking due notice of her protection as a witness, the immunity she invokes extends no farther than to shield her from civil liability for harm occasioned by the testimony. It cannot be stretched to cover all **collateral public-law consequences**[5] that adversely affect her claim to governmental benefits.

4.  For the criminal cases in controversy, *see infra* note 14.

5.  **Adverse public-law consequences are all those which constitute the collateral effect of judgments or convictions.** For example, nondischargeability in bankruptcy is a collateral adverse consequence of a civil judgment based on fraud and deceit or of a judgment for child support. There are many adverse collateral consequences of a felony conviction, such as the loss of right to vote, eligibility for citizenship, national security clearance, as well as licensing and employment-related restrictions, disqualification from military service or from holding public office. The loss of a driver's license is another collateral consequence of some criminal convictions. *See in this connection* Margaret Colgate Love, *Starting Over With A Clean Slate: In Praise Of A Forgotten Section Of The Model Penal Code,* 2003 Fordham Urban Law Journal 1705.

6.  The immunity of parties and witnesses from liability in damages for giving harmful testimony in judicial proceedings was established early in the English common law. *See Briscoe v. LaHue,* 460 U.S. 325, 330–31, 103 S.Ct. 1108, 1113, 75 L.Ed.2d 96 (1983), in which the Court cites *Cutler v. Dixon,* 76 Eng. Rep. 886 (K.B.1585) and *Anfield v. Feverhill,* 80 Eng. Rep. 1113 (K.B. 1614) as early English authority for the immunity doctrine.

7.  *Briscoe, supra* note 6, 460 U.S. at 345–46, 103 S.Ct. at 1121.

8.  *Hammett v. Hunter,* 1941 OK 253, ¶ 0, 117 P.2d 511, 511 syl.1 ("1. Defamatory words published by the parties, counsel or witnesses, in due course of a judicial proceeding and which are connected with, or relevant or material to, the cause in hand or subject of inquiry, constitute an absolutely privileged communication, and no action will lie therefor, however false or malicious

## The Outer Limit of Witness Immunity

¶ 5 At common law witnesses were immune from suits to recover damages for harm occasioned by testimony given in judicial proceedings.[6] Federal constitutional jurisprudence has extended witness immunity to civil suits brought under 42 U.S.C. § 1983.[7] Oklahoma has long recognized that lawyers, parties and witnesses are immune from defamation and certain other claims rested upon communications made during, or preliminary to, judicial proceedings as long as the communication is in some way relevant to the proceeding.[8] Recent Oklahoma jurisprudence has extended the witness immunity shield to protect against tort actions for damages occasioned by one's perjury (but not to criminal prosecutions for perjury).[9]

they may in fact be."); *Kirschstein v. Haynes,* 1990 OK 8, 788 P.2d 941 (the immunity doctrine (a) *applies* not only to defamation suits, but also to suits for intentional infliction of emotional distress arising from the same circumstances as the defamation claim, and (b) *encompasses* communications made preliminary to judicial or quasi-judicial proceedings). *See also Pacific Employers Ins. Co. v. Adams,* 1946 OK 86, 168 P.2d 105 (statements made in a physician's report attached to pleading filed in the State Industrial Court are immune); *Hughes v. Bizzell,* 1941 OK 277, 117 P.2d 763 (statements made at a hearing before the University Board of Regents to determine if discharge of employee should be upheld are immune); *Sanford v. Howard,* 1939 OK 343, 95 P.2d 644 (statements made during a session of the University Board of Regents concerning an employee's alleged immoral conduct are immune); *Dickerson v. Crozier,* 1927 OK 401, 261 P. 545 (statements made in a complaint in the city police court are immune).

9.  *Cooper v. Parker–Hughey,* 1995 OK 35, 894 P.2d 1096, 1098. There the court identified the following public-policy reasons for **rejecting perjury as a tort:** (1) absolute immunity for witnesses in a judicial proceeding encourages witnesses to speak freely without fear of civil liability; (2) perjury is a public offense and regulated solely by criminal law; (3) the need for finality in judgments, (4) the possibility of a multiplicity of suits by parties dissatisfied with the outcome of trials, and (5) lack of precedent for such actions. *Id.* at ¶ 27, at 1101. The court relied heavily on the reasoning expressed in *Briscoe, supra* note 6, a 1983 United States Supreme Court decision in which convicted defendants brought a civil rights action against police officers who testified against them, alleging that the officers violated the defendants' constitutional rights to due process and a fair trial by falsely testifying that the criminal defendants had been able to harmonize their stories, thereby rendering the exculpatory

¶ 6 Adverse collateral public-law consequences of a witness' testimony, such as those flowing from a criminal prosecution for perjury, professional discipline, and from other forms of censure and sanction, fall outside the ambit of witness immunity. That immunity will not protect an attorney from professional discipline based on unethical conduct resulting in defamation.[10] A number of states and the federal government have imposed professional discipline on lawyers for perjury and other litigation-related misconduct, holding that these consequences, though immunized from civil liability, nonetheless lie dehors the witness immunity shield.[11] Others have indicated (in dicta) that **an attorney remains subject to professional discipline** for litigation-related misconduct even where redress by civil action is unavailable because of witness immunity.[12]

statements of each criminal defendant less credible. *Id.* at 332–33, 103 S.Ct. at 1114–15.

10. *Kirschstein, supra* note 8, at ¶ 19, at 951; *see also Selby v. Burgess,* 289 Ark. 491, 712 S.W.2d 898, 900 (1986) (the privilege does not immunize an attorney from liability for professional discipline).

11. *See, e.g., Imbler v. Pachtman,* 424 U.S. 409, 428–29, 96 S.Ct. 984, 994, 47 L.Ed.2d 128 (1976) **(prosecutorial immunity from liability in civil suits brought under 42 U.S.C. § 1983 does not leave the public without recourse to censure prosecutorial misconduct because prosecutors remain subject to professional discipline).** *See also Attorney Grievance Commission v. White,* 354 Md. 346, 731 A.2d 447 (1999); *Barreiro v. State Bar,* 2 Cal.3d 912, 88 Cal.Rptr. 192, 471 P.2d 992 (1970); *Montag v. State Bar,* 32 Cal.3d 721, 186 Cal.Rptr. 894, 652 P.2d 1370 (1982); *Montgomery County Bar Association v. Hecht,* 456 Pa. 13, 317 A.2d 597 (1974); *United States v. Modica,* 663 F.2d 1173, 1185 (2d Cir.1981) (the court observed that "the message of a single thirty-day suspension from practice would be far clearer than the disapproving remarks in a score of appellate opinions"); *McGuire v. State,* 100 Nev. 153, 677 P.2d 1060 (1984) (a prosecutor is fined $500 for "extreme and outrageous" misconduct); *United States v. Ranger Elec. Communications, Inc.,* 22 F.Supp.2d 667 (W.D.Mich.1998); *Matter of Barratt,* 663 N.E.2d 536 (Ind.1996); *see also* Carissa Hessick, *Prosecutorial subornation of perjury: Is the fair justice agency the solution we have been looking for?,* 2002 South Dakota L.Rev. 255.

## The Adverse Consequence of Gilchrist's Breach of Public–Employment Duty To Maintain Scientific Integrity In Her Work Performance

¶ 7 While employed as a police department's forensic chemist, Gilchrist had a duty to maintain scientific integrity in her work. Obedience to this level of performance is exacted by the public-law standards that govern constitutional strictures for guilt determination in criminal prosecutions. That duty's breach is now advanced as misconduct (in the § 2–406 sense) to defeat her claim for unemployment compensation. Gilchrist's witness immunity[13] will not protect her against this adverse consequence of public employment. **Shielded by that immunity is solely civil liability in damages for harm occasioned by one's testimonial falsehood.**

¶ 8 In short, the denial of unemployment benefits is a **sanctioned adverse collateral**

12. *See Stucchio v. Tincher,* 726 So.2d 372, 374 (Fla.App.1999) ("[r]emedies for perjury, slander, and the like committed during judicial proceedings are left to the discipline of the courts, the bar association, and the state"); *Selby v. Burgess,* 289 Ark. 491, 712 S.W.2d 898, 900 (1986) (while the privilege protects an attorney from litigation it will not make him immune from professional discipline); *Theiss v. Scherer,* 17 Ohio Misc. 172, 396 F.2d 646, 649 (6th Cir.1968); *Ruberton v. Gabage,* 280 N.J.Super. 125, 654 A.2d 1002, 1007 (N.J.Super.Ct.App.Div.1995) (the absolute privilege applies only to claims of tortious conduct and not to a claim of unprofessional conduct or to summary contempt proceedings against the offending lawyer).

13. There are various types of immunities—testimonial immunity, immunity from suit (legislative, executive, judicial, or diplomatic), immunity from civil liability, immunity from prosecution, as well as use immunity. **Use immunity** prohibits the use of compelled testimony or any evidence derived from that testimony against the witness in a criminal prosecution. If evidence is compelled under a grant of immunity and there is a later prosecution, the government has the burden of demonstrating that "the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar v. United States,* 406 U.S. 441, 452–53, 92 S.Ct. 1653, 1653, 32 L.Ed.2d 212 (1972) (to preserve the witness' privilege against self-incrimination, the prosecution is precluded from using against the defendant any responsive testimony elicited from him or any evidence derived therefrom).

public-law consequence of Gilchrist's testimonial improprieties.[14]

## II

GILCHRIST APPEARS TO ARGUE THAT THE GOVERNMENT'S USE OF HER TESTIMONY TO SHOW "MISCONDUCT" (IN THE § 2–406 SENSE) OFFENDS THE FIRST AMENDMENT'S FREE–SPEECH CLAUSE PROTECTION AGAINST HAVING HER CLAIM TO UNEMPLOYMENT BENEFITS BURDENED BY AN UNCONSTITUTIONAL CONDITION

¶ 9 Gilchrist claims that the denial of unemployment benefits based on mere judicial disagreement with the content of her testimony as an expert witness in criminal cases infringes upon her First Amendment right to speak freely. Relying on *Worrell v. Henry*[15] and other federal circuit jurisprudence,[16] she argues that the denial of benefits cannot be rested on a **constitutionally impermissible condition**—one that places a penalty on her exercise of free-speech guarantee.[17] She reasons and urges that the denial of unemployment benefits based on her testimony as an expert witness constitutes government censorship and violates her protected freedom of expression on matters of public concern.

¶ 10 **The First Amendment is not implicated here.** The government's scrutiny of her testimony for its lack of support in elicited scientific data does not offend the First Amendment's Free Speech Clause. **Much like commercial speech,**[18] **testimony must always conform to the reality of established facts.** Neither does the **use of judicial analyses of Gilchrist's testimonial impropriety** (in the discharge of her employment duties) offend constitutional protection of her utterance from government retaliation. Disapproval here comes from her testimony's failure to meet the minimum standards of scientific integrity. The government did not tender these analyses for any purpose other than to show her substandard professional performance as a forensic analyst. No constitutional barrier, federal or state, has been identified to prohibit the use of judicial analyses of a public

14. The Oklahoma Security Commission relied for proof of Gilchrist's misconduct on the judicial analyses of her testimony in *Mitchell v. Ward*, 150 F.Supp.2d 1194 (W.D.Okl.1999); *Mitchell v. Gibson*, 262 F.3d 1036 (10th Cir.2001); *McCarty v. State*, 1995 OK CR 48, 904 P.2d 110; *Cannon v. Gibson*, 259 F.3d 1253 (10th Cir.2001); *Pierce v. State*, 1990 OK CR 7, 786 P.2d 1255; *Ables v. State*, OK CR F–1986–776 (unpublished); *Fox v. State*, 1989 OK CR 51, 779 P.2d 562; *McCarty v. State*, 1988 OK CR 271, 765 P.2d 1215.

15. 219 F.3d 1197, 1209 (10th Cir.2000). In *Worrell* the court held that a prosecutor's office did not offend the First Amendment when it rescinded an offer to hire an individual to be a drug task force coordinator because he had testified as an expert defense witness in a murder trial. A district attorney's interest in maintaining an efficient drug task force outweighed the applicant's interest in avoiding retaliation for his testimony as an expert witness against a police officer. Announcing a three-part standard for evaluating First Amendment retaliation claims, the court stated that a plaintiff must prove (1) that the plaintiff "was engaged in constitutionally protected activity"; (2) that the defendant's actions caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) that the "defendant's adverse action was substantially motivated as a response to the plaintiff's

exercise of constitutionally protected conduct." *Id.*, at 1212.

16. *Lytle v. City of Haysville*, 138 F.3d 857, 867 (10th Cir.1998); *Melton v. City of Oklahoma City*, 879 F.2d 706, 714 (10th Cir.1989).

17. Gilchrist claims that *Melton, supra* note 16, and *Worrell, supra* note 15, are applications of the doctrine against placing constitutionally impermissible conditions on one's right. For this doctrine, she quotes *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 674, 116 S.Ct. 2342, 2347, 135 L.Ed.2d 843 (1996). The "modern 'unconstitutional conditions' doctrine holds that the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech' even if he has no entitlement to that benefit." *Id.*, quoting *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).

18. "Truthful advertising related to lawful activities is entitled to the protections of the First Amendment." *Matter of R.M.J.*, 455 U.S. 191, 102 S.Ct. 929, 937–38, 71 L.Ed.2d 64 (1982). False, deceptive or misleading advertising is subject to governmental restraint. *Bates v. State Bar of Arizona*, 433 U.S. 350, 383–384, 97 S.Ct. 2691, 2708–2709, 53 L.Ed.2d 810 (1977).

employee's expert testimony as proof of unacceptable job performance. Moreover, government's demonstration of legitimate problems adversely affecting an employee's discharge of public employment duties cannot be mistaken for a constitutionally impermissible retaliatory response. No one would dare deny that the government has a compelling interest in maintaining acceptable job performance standards for its personnel.

¶ 11 Conditioning a public employee's claim to a governmental benefit on conformity to the norms of scientific integrity in carrying out her day-to-day work duties does not place a constitutionally prohibited burden on its benefit. In sum, the claim-burdening condition of which Gilchrist complains is clearly authorized—nay, mandated—by this Nation's highest norms of federal law—its regime of constitutional strictures that govern the process of guilt determination in criminal prosecutions.