2011 OK CIV APP 9

**Ted EVANS, Jr., Plaintiff/Appellee,**

**v.**

**OKLAHOMA EMPLOYMENT SECURITY COMMISSION, Defendant/Appellant,**

**and**

**Board of Review, Appeal Tribunal, and the Oklahoma State Department of Health, Employer, Defendants.**

**No. 106939.**

Court of Civil Appeals of Oklahoma, Division No. 2.

Oct. 28, 2010.

Samuel L. Talley, Talley, Crowder & Talley, Norman, OK, for Plaintiff/Appellee.

Teresa Thomas Keller, Oklahoma Employment Security Commission, Oklahoma City, OK, for Defendant/Appellant Oklahoma Employment Security Commission.

DEBORAH B. BARNES, Judge.

¶ 1 The Oklahoma Employment Security Commission (OESC) appeals the district court's order, filed on March 2, 2009, reversing the Board of Review's decision that denied unemployment compensation benefits to appellee Ted Evans, Jr.[1] (Evans) pursuant to 40 O.S.2001 § 2–406, because he was terminated for "misconduct." On appeal, OESC argues that the district court erred because the decision of the Board of Review, which had affirmed the findings of fact and conclu-

sions of law of the Appeal Tribunal, was supported by the evidence and was not contrary to law. We disagree and affirm the district court's order.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 The relevant facts are not in dispute. Evans was employed by the Oklahoma State Department of Health (OSDH) since May 1, 1981. On August 30, 2007, he was terminated for "misconduct relating to a conflict of interest."[2] At the time of his termination, Evans served as the "Chief of the Consumer Health Service"[3] for the State of Oklahoma Department of Health and oversaw the regulation of the Oklahoma tattooing industry.[4] He was also "responsible for administering a number of regulatory programs, including food service, body piercing, x-ray," as well as various occupational licensing.[5]

¶ 3 Evans' son was a licensed tattoo artist and the proprietor of Eden Body Art, a tattoo business located in Lawton, Oklahoma.[6] Evans also lived a short distance from Lawton.[7] Although Evans never told his current supervisor, Dr. Henry Hartsell, Jr., about the potential conflict of interest between him and his son, Evans had verbally informed his previous supervisor, Rocky McElvaney.[8] According to Evans, he assumed that he had disclosed the conflict of interest because "[e]verybody knew in my office, Rocky ... knew" that his son was a tattoo artist.[9]

¶ 4 On November 1, 2006, a state law was to take effect that required all tattoo businesses to obtain an operating license from

---

1. Although the Oklahoma Supreme Court case file refers to Evans as "Ted Evans," we refer to Evans as he identifies himself—"Ted Evans, Jr." (Transcription of the tape of the telephonic hearing held by the Appeal Tribunal on October 16, 2007, at Record of Proceedings Before the Board of Review, Record (R.), p. 105.)

2. R., p. 131.

3. R., p. 119.

4. Record from Comanche District Court Clerk's office, p. 58.

5. R., p. 119, (testimony of Dr. Henry Hartsell, Jr., Deputy Commissioner for Protective Health Services for the State of Oklahoma).

6. R., pp. 165–166.

7. R., p. 190.

8. R., p. 179.

9. R., p. 180.

OSDH. *See* 21 O.S. Supp.2006 § 842.3(A).[10] At the Appeal Tribunal hearing, Dr. Hartsell, the Deputy Commissioner for Protective Health Services at OSDH and Evans' supervisor,[11] testified that Evans ordered an employee of the field staff to perform a site inspection of Evans' son's tattoo business, Eden Body Art, on November 1, 2006, in order to license it as the first tattoo establishment in the state.[12] Tressa Madden, the Director of Consumer Protection who was the supervisor of the field staff and was directly supervised by Evans, testified Evans ordered this inspection in direct contradiction to what she had previously instructed her employee.[13]

¶ 5 Evans testified on another occasion he directed Nita Cable, one of his employees, to re-verify that Rat Pack Tattoo Parlor—one of Eden Body Art's competitors—was in compliance with a law requiring tattoo establishments to be located at least 1,000 feet away from any school or church.[14] Evans stated that he ordered the re-verification because of a complaint by Billy Jack Charnek, one of Evans' son's employees at Eden Body Art.[15] Although the employee "had [already] inspected it and it was over 1,000 [feet from a school]," Evans asked Cable "to go back and make sure that it was measured correctly." [16] The re-verification determined that Rat Pack

Tattoo Parlor was, as previously determined, located more than 1,000 feet from a school, and therefore permissibly situated to obtain an operating license.[17]

¶ 6 After Evans received another complaint from Charnek, alleging that a Lawton tattoo business called Generation X was operating illegally on the weekends, Evans testified he asked Cable to investigate this complaint.[18] After Cable made several unsuccessful attempts to investigate, Evans personally visited the Generation X tattoo establishment to ensure it was not operating without a license on the weekends.[19] Evans stated he told the owner that, under OSDH regulations, he would not be able to obtain a license because the business was located less than 1,000 feet from a church.[20] According to Evans, he also informed the owner that he could be fined up to $5,000 for tattooing without a license.[21] Evans testified that he routinely informed tattoo business owners regarding OSDH's regulatory policies and that this situation was no different.[22]

¶ 7 Dr. Hartsell testified that in March 2007, he held a regular meeting with the service chiefs, including Evans, in which they discussed conflicts of interest and he advised "them and their staff members to periodically revisit … conflict of interest state-

---

10. "All body piercing operators, tattoo operators and artists shall be prohibited from performing body piercing or tattooing unless licensed in the appropriate category by the State Department of Health. The State Board of Health shall promulgate rules regulating body piercing and tattooing...." 21 O.S. Supp.2006 § 842.3(A).

11. R., p. 119.

12. R., p. 145.

13. R., p. 172.

14. R., p. 182. "The State Department of Health shall not grant or issue a license to a body piercing or tattoo operator if the place of business of the body piercing or tattoo operator is within one thousand (1,000) feet of a church, school, or playground." 21 O.S. Supp.2006 § 842.3(C)(1).

15. R., p. 182.

16. *Id.*

17. R., p. 59, "Employer Exhibit 2," Transcription of June 28, 2007, Interview of Evans by Dr. Hartsell.

18. R., p. 183.

19. *Id.*

20. R., p. 44.

21. *Id.* According to 21 O.S. Supp.2006 § 842.3(F), "The State Department of Health may notify the district attorney of any violation of Section 842.1 of this title or rules promulgated pursuant thereto and, in addition to any criminal penalty imposed, *the Department may impose an administrative fine not to exceed Five Thousand Dollars ($5,000.00) per violation per day*, and may suspend, revoke or deny the license of the establishment, or may impose both such administrative fine and suspension, revocation or denial for any such violation." (Emphasis added.)

22. R., p. 191.

ments."[23] According to Evans, at this meeting Dr. Hartsell discussed the conflict of interest form that required an employee to disclose whether they had a conflict of interest as defined by OSDH policy.[24] Evans admitted that Dr. Hartsell informed him of where he could access the form[25] and that he knew where OSDH's policy was located.[26] Dr. Hartsell testified that despite Evans' knowledge of OSDH's conflict of interest policy, Evans signed the conflict of interest form indicating that he had "No" "conflict of interest as defined by this policy," and returned the form to him on April 2, 2007.[27]

¶ 8 When asked at the hearing to explain his inaccurate response on the conflict of interest form, Evans responded: "It was just a big mistake. I had no intentions of concealing anything, I just made a big mistake on it."[28] He also testified that he "wasn't thinking. I thought I had disclosed that to my supervisor."[29] Dr. Hartsell testified, however, that he did not believe Evans' inaccurate response was a mistake.[30]

¶ 9 After receiving a complaint regarding Evans' involvement in a tattoo convention in which Evans' son participated, Dr. Hartsell testified that in May 2007, he relieved Evans of that portion of his job duties that involved tattoo enforcement while the matter was being investigated.[31] Evans stated that after the complaint he informed Dr. Hartsell he would take a "hands off" approach to any potential future conflicts of interest.[32] Evans stated his actions did not lead to any benefit for his son, nor did OSDH establish that Evans had any financial involvement or interest in his son's tattoo business.[33]

Upon completion of the investigation of Evans' actions, Dr. Hartsell recommended to the Commissioner of Health that Evans be terminated for misconduct because of his:

> failing to disclose . . . his conflict of interest[,] and then his actions relating to directing surveyors to perform activities at his son's establishment, directing the surveyors to perform activities at other establishments in the Lawton area where his son operated a facility . . . his personal site visit to one location in Lawton[,] [a]nd his interference with the staff regarding the tattoo convention in early May.[34]

Evans was terminated on August 30, 2007,[35] after twenty-six years of employment with OSDH and only two months short of retirement.[36]

¶ 10 Evans applied for unemployment benefits with OESC but was denied. He appealed to the Appeal Tribunal, which, in an order entered on October 23, 2007, found that:

–3–

> [Evans] was discharged due to a conflict of interest in violation of the employer's policy. The terminal instance occurred when the claimant performed job functions directly involving his son's business as well as his son's competitors[ ] . . . . [Evans] verbally disclosed this potential conflict of interest to the employer and indicated he would take a hands off approach with regard[ ] to his son's business and isolate himself from involvement. As Chief he was aware of the employer's company poli-

---

**23.** R., p. 120.

**24.** R., p. 192. The OSDH conflict of interest policy was not made part of the record on appeal.

**25.** *Id.*

**26.** *Id.*

**27.** R., pp. 120–121 and, R., p. 5, "Employer Exhibit 1," Conflict of Interest form which states: "I have read, understand and agree to abide by Oklahoma State Department of Health Procedure Number 6–26, Conflict of Interest, issued January 2001 found in the Administrative Procedures Manual."

**28.** R., p. 180.

**29.** R., p. 193.

**30.** R., p. 163.

**31.** R., pp. 130, 142–144.

**32.** R., pp. 125, 189–190.

**33.** R., pp. 180–181, 196.

**34.** R., p. 131.

**35.** R., p. 199, Appeal Tribunal's Order of Decision.

**36.** R., p. 181.

cies and procedures regarding conflict of interest.

–4–

... [Evans] chose to personally perform an inspection/investigation on a shop in Lawton which was his son's competitor and threatened fine and closure. After the supervisor in charge of the inspectors had already directed a proximity check of an establishment to assure compliance with the distance statute, [Evans] directed the inspector to re-measure a Lawton competitor for potential violation of the statute after his son or his son's workers complained. He chose to personally investigate or initiate investigation of complaints regarding his son's Lawton competitors which were received from his son as well as persons working for his son. He had a subordinate normally assigned to direct and perform those tasks but chose to take them on himself.

. . . .

–6–

Even though, through oversight or error, [Evans] did not disclose his son's relationship in writing, he did do so verbally and to the appropriate parties. By his own admission, [Evans] was in a position of high authority within the agency, he was aware of the employer's policies and regulations regarding conflict of interests, he was charged with the regulation of the tattoo industry, and he was very cognizant of the potential for a conflict of interest surrounding his son's business. Therefore, his actions show an act or course of conduct evidencing such *willful* or *wanton disregard* of an employer's interest as is found in *deliberate* violation or disregard of standard of behavior which the employer has the right to expect of his employee. Even though [Evans] indicated he would isolate himself from his son's business, the evidence as presented indicates he *knowingly* and *intentionally* chose to become personally involved in investigations, inspections, and complaints which were directly related to his son's business and which resulted in a conflict of interest for

him. Therefore, [Evans] was discharged for misconduct connected with the work and benefits should be denied.[37] (Emphasis added.)

Evans then appealed to the Board of Review, which adopted the findings of the Appeal Tribunal and affirmed its decision.[38]

¶11 Evans appealed this decision to the District Court of Comanche County. He argued, in pertinent part, that:

D. Plaintiff took actions in his position that were prudent under all circumstances in his general regulation of the tattooing industry which included scrutinizing boundary lines, licensure requests, and health inspections. Evidence was uncontroverted that Plaintiff did not discriminate against any tattoo artist in this state due to his disclosed conflict of interest and that Plaintiff performed his job duties when regulating all tattoo artists he came into contact with, in good faith, and according to the rules of the State Department of Health.

E. No evidence was ever shown or ever existed that demonstrates that Plaintiff's son was given special treatment by Plaintiff, in his official position, or that Plaintiff's son got his license by fraud with the help of Plaintiff. No evidence was ever shown or ever existed that demonstrates that Plaintiff was financially invested in his son's business. No evidence was ever shown that Plaintiff's actions in directing the Tattoo Industry were unlawful or against policy of Defendant/Employer and all of his actions were according to the charge of his position within the Department.

F. Plaintiff failed to correctly check the box on a Department form that he had a conflict of interest in fact, by his son being a licensed tattoo artist, in or around April of 2007 this year. The appeal tribunal states that this fact in and of itself is not determinative of misconduct since Plaintiff had previously disclosed his conflict of in-

---

**37.** R., pp. 199–200.  **38.** R., p. 202.

terest orally and to the appropriate parties.[39]

¶ 12 The district court reversed, finding that "[t]he evidence produced and conclusions reached at the [Appeal] Tribunal and Board of Review do not support a finding of misconduct as required to deny benefits...."[40] From this order reversing the Board's decision, OESC appeals.

## STANDARD OF REVIEW

¶ 13 On appeal, "the findings of the Board of Review as to the facts, if supported by evidence, shall be conclusive and the jurisdiction of the court shall be confined to questions of law." 40 O.S. Supp.2008 § 2–610(1). This standard of review is the same as that of the district court. *Gilchrist v. Board of Review of the Oklahoma Employment Security Commission*, 2004 OK 47, ¶ 6, 94 P.3d 72, 74. Whether any given act occurred is a question of fact to be determined by the Board of Review. *Id.* The separate question of whether the employee's actions constitute disqualifying "misconduct" is a question of law and subject to plenary review. *Id.*

## ANALYSIS

¶ 14 OESC argues that the district court erred in determining that the evidence presented did not, as a matter of law, support a finding that Evans' actions constituted disqualifying "misconduct." We are not persuaded and therefore affirm the district court's order.

¶ 15 The Oklahoma Employment Security Act provides that "[a]n individual shall be disqualified for [unemployment] benefits if he has been discharged for misconduct connected with his last work...." 40 O.S.2001 § 2–406. The Oklahoma Supreme Court defines the term "misconduct" as:

> conduct evincing such *wilful* or *wanton disregard* of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. (Emphasis added.)

*Vester*, ¶ 12, 697 P.2d 533, 537 (quoting *Boynton Cab Co. v. Neubeck*, 237 Wis. 249, 296 N.W. 636, 640 (1941)). However, "mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances,[41] or good faith errors in judgment or discretion are not to be deemed 'misconduct' within the meaning of the statute." *Id.*[42]

¶ 16 Because unemployment benefits should be awarded to "persons unemployed through *no fault of their own,*" 40 O.S.2001 § 1–103 (emphasis added), the definition of misconduct requires a degree of *deliberate* behavior by the employee. *Farm Fresh Dairy, Inc. v. Blackburn*, 1992 OK 148, ¶ 11,

---

**39.** Evans' Petition for Review, Comanche County District Court Record, p. 2.

**40.** Comanche County District Court Record, p. 56.

**41.** In *Vogle v. Oklahoma Employment Security Commission*, this Court held that a department store worker did not engage in disqualifying misconduct when she mistakenly took a perfume tester home without the permission of her supervisor. 1991 OK CIV APP 84, ¶ 15, 817 P.2d 268, 271. We observed that, "[t]he conduct of [the employee] may have been inadvert[e]nce or ordinary negligence ... but it does not constitute the type of conduct ... which would divest her right to unemployment benefits" because "[her] conduct was not wilful or intentional." *Id.* at ¶ 14, 817 P.2d at 270.

**42.** The Oklahoma Supreme Court in *Vester* addressed the issue of misconduct in the context of employee absences. In *Vester*, an employee was chronically tardy for work-missing over 600 hours of work in a single year. *Vester v. Board of Review of the Oklahoma Employment Security Commission*, 1985 OK 21, ¶ 5, 697 P.2d 533, 535. The Court held that the evidence presented did not establish disqualifying misconduct, however, because the employee informed her employer that she would be absent, and because her absenteeism was a result of health-related problems. *Id.* at ¶ 17, 697 P.2d at 538. A finding of misconduct must include an element of willfulness or culpable negligence that was lacking because "such absences have been required to be unexplained, unexcused, unjustified or unreported...." *Id.* at ¶ 16.

841 P.2d 1150, 1152; *see also Uniroyal Goodrich Tire Co. v. Oklahoma Employment Security Commission,* 1996 OK CIV APP 7, ¶ 10, 913 P.2d 1377, 1381 ("a decision of the OESC contrary to the underlying purpose of the Oklahoma Employment Security Act is erroneous as a matter of law."). "[T]he misconduct standard contemplates *both* the nature of the act undertaken by the employee and the employee's state of mind at the time the event(s) occurred." *Kakkanatt v. Oklahoma Employment Security Commission,* 2008 OK CIV APP 38, ¶ 14, 183 P.3d 1032, 1035. (Emphasis in original.)

■ ¶ 17 Although this standard of misconduct is meant to balance the rights of the employer and the employee, § 2–406 should be construed narrowly and in favor of the employee. *Vester* at ¶ 15, 697 P.2d at 537. The employer has the burden of establishing that the employee engaged in misconduct. *Tynes v. Uniroyal Tire Co.,* 1984 OK CIV APP 20, ¶ 6, 679 P.2d 1310.

### I. Alleged Violation of the Conflict of Interest Policy

■ ¶ 18 Where a violation of an employer's policy is alleged to constitute misconduct, the burden is on the employer to establish the existence of the policy, the reasonableness of the policy, and the employee's violation of that policy. *Grace Drilling Co. v. Novotny,* 1991 OK CIV APP 24, ¶ 7, 811 P.2d 907, 908 ("[w]hether an employee's action constitutes statutory misconduct must be determined by reference to the conduct proscribed in the controlling statute. An employer may not, merely by passing a rule, disqualify as misconduct actions which, absent the rule, would not meet the statutory definition."); *Tynes* at ¶ 11, 679 P.2d at 1313 (noting that OESC's finding of misconduct

was erroneous because it "apparently relied on the premise that the company rule was reasonable and violation of it was misconduct *per se*.").

¶ 19 Here, however, OSDH's conflict of interest policy is conspicuously absent from the record.[43] This Court is left at a decided disadvantage when material information is not made available in the record on appeal. Because we are unable to review OSDH's conflict of interest policy, OESC has failed to carry its burden in this respect and we therefore cannot say that Evans' alleged violation of an alleged policy, standing alone, disqualifies him from unemployment benefits.

### II. Misconduct as a Matter of Law

■ ¶ 20 The Appeal Tribunal, affirmed by the Board of Review, found that Evans' involvement in his son's tattoo business and its competitors constituted a "deliberate violation or disregard of [the] standard of behavior which [OSDH] has the right to expect of [its] employee."[44] OESC argues that this finding is supported by competent evidence and not contrary to law, and the district court erred by reversing that decision. We disagree.

¶ 21 As stated above in more detail, misconduct may be found where an employee manifests an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. *Vester* at ¶ 12, 697 P.2d at 537. As set forth below, we find that Evans did not act in disregard of his employer's interests, but rather he acted to meet his obligations to OSDH as his professional duties required.

¶ 22 The Appeal Tribunal and the Board of Review found that Evans filled out the con-

**43.** We note that there exists a strong state public policy in limiting the potentially negative effects of public officials with conflicts of interest. Dr. Hartsell testified that OSDH has "tremendous responsibilities ... to uphold the common good," and that "[t]here's an expectation that [OSDH employees] will pursue [their] duties[ ] impartially and fairly for all...." R., p. 123. The Oklahoma Constitution mandates that "the Ethics Commission shall promulgate rules of ethical conduct for state officers and employees, including civil penalties for violation of these rules." Okla. Const. art. 29, § 3(B). The Ethics

Commission promulgated and the Oklahoma Legislature adopted such rules, including rules related to conflicts of interest, because they help "to develop public confidence in persons seeking or holding state office or employment, to enhance the dignity of state government, and to make it attractive to citizens who are motivated to public service." 74 O.S.2001, ch. 62, app., 257:20–1–1.

**44.** R., p. 200.

flict of interest form inaccurately not because he intended to deceive his supervisors, but rather out of "oversight or error." [45] Further, the Appeal Tribunal and the Board of Review found that despite Evans' inaccurate response on the form, he did disclose his conflict "verbally and to the appropriate parties." [46] These findings are supported by the evidence. Dr. Hartsell testified that both he and Evans were directly supervised [47] by Rocky McElvaney on May 10, 2006, when the Legislature enacted § 842.1 *et seq.*, allowing tattooing in Oklahoma, although the new law's effective date was not until November 1, 2006. Dr. Hartsell further testified he did not become Evans' direct supervisor until December 26, 2006,[48] nearly two months into Evans' new duties regarding tattooing. Evans stated that he did not "directly" inform Dr. Hartsell that his son was a tattoo artist, explaining that he assumed Dr. Hartsell knew because "[e]verybody knew in my office, Rocky McElvaney knew." [49]

¶ 23 For six months after enactment until the effective date of the new tattoo legislation, Evans continued to perform all his other job duties, including monitoring of body piercing establishments. For two months after enactment, up until December 26, 2006, when his supervisor changed, he performed his duties regarding tattoo establishments, including inspections of his son's establishment in November of 2006, as well as an inspection of another establishment, the Rat Pack. Even after Dr. Hartsell became his supervisor, Evans continued to perform his duties consistent with his position regarding tattoo establishments, including inspections and monitoring of Oklahoma's first tattoo convention under the new law in early May 2007.[50]

¶ 24 In a staff meeting in late March of 2007, Dr. Hartsell asked staff to fill out conflict of interest forms. The form Evans completed in error was dated April 2, 2007.

Evans inspected the Generation X establishment in April 2007, and on May 3, 2007, Cable visited an establishment at Evans' request. Evans referred some matters to Madden and to Cable. He also drove by an establishment in Elk City.

¶ 25 It was not until May 12, 2007, six weeks after Evans turned in his form and after six months of job performance under the new tattooing law, that Dr. Hartsell relieved Evans of that portion of his duties regarding tattooing when he became aware that Evans' son was a licensed tattoo artist. Why Dr. Hartsell, who took over as Evans' supervisor in December 2006, was not aware of what Evans was doing in his day-to-day job and was not aware of who was licensed to tattoo in Oklahoma until five months into his supervisory position is unknown. Nevertheless, after May 12, 2007, Evans took no more actions regarding tattoo establishments but continued to perform his other duties.

¶ 26 Another six weeks passed. Dr. Hartsell then interviewed Evans on June 28, 2007, pursuant to an investigation, transcribed on July 10, 2007. Evans testified at the telephonic hearing held by the Appeal Tribunal that Charnek, who previously worked for Evans' son and had been terminated, had a grudge against Evans. Evans testified there were postings on MySpace by Charnek in which he said he would push this forward until he had Evans' job and also emails in which Charnek was laughing out loud at Evans' son because Evans indeed lost his job.[51] Dr. Hartsell admitted receiving emails from Charnek.[52]

¶ 27 We find that Evans did not act outside his authority as Chief of the Consumer Health Service. For instance, Evans acted within his job duties when he ordered the re-inspection of Rat Pack Tattoo Parlor.[53] In addition, Evans visited Generation X only

45. R., p. 200.

46. *Id.*

47. R., p. 137.

48. R., pp. 136–137.

49. R., pp. 73–77, 179–180, 189–190.

50. R., p. 131.

51. R., p. 186.

52. R., pp. 142; 151–152.

53. R., p. 182.

after a subordinate was unable to make contact with the owner because the nature of the complaint required a weekend visit.[54]

¶ 28 In fact, counsel for OSDH admits that "[w]hether or not anything that [Evans] did actually had an adverse effect on the agency's interests or whether it resulted in favoritism for his son, *the appearance was the problem* ...."[55] (Emphasis added.) Counsel for Evans responded:

... I thought it was interesting when [counsel for OSDH] said the *appearance of impropriety* was the problem, and not actual impropriety. I don't think that meets the legal standard of misconduct, especially since you've got to consider the timeline. You know .... him being taken off the tattooing industry didn't happen until May of 2007 ...

... And [the agency] knew what was going on—they knew his son was an artist.

... [Y]ou'll not find any testimony in there that said Dr. Hartsell didn't know his son was a tattoo artist when he didn't check the form.

... But they still trusted him to do his job and perform things....

Everything that he did, all the times that he ordered his people to carry out the laws of the State of Oklahoma and have work performed on license inspections, distance inspections—I mean, he's doing his job. It's really just as simple as that.[56] (Emphasis added.)

¶ 29 Evans stated in his interview, regarding his completion of the conflict of interest form:

I made a mistake. I should have done that. I verbally told everybody, Nick Slaymaker, and Rocky [McElvaney], and everybody that my son—...

Nick and other people that I had conversations with in legal, and Tressa and everybody. I told everybody that my son was

considering becoming an artist, and I should have filled out that—that form.... Because I'd been so open about it I didn't even think about it.

...

That could be a conflict, yes....

I've been so open about it, and I told everybody upfront, including, Rocky, that I was going to stay away from that program as much as I could and let Tressa handle it....

Because that could be a conflict....

I don't think I've done anything wrong other than not filling out that form. That was a stupid mistake on my part. I've tried to be open about it, honest, not provide any favoritism to anybody. You know, I just stayed away from it as much as I could, except where I seen things were going—looked to me like they were going wrong. Then I stepped in and had some input on what was going on.[57]

¶ 30 When asked what was his idea of taking a "hands-off approach," Evans testified at the hearing, "I was trying to make sure that we were responsive and responsible where we were lacking.... I tried to shore up what I believed to be us not responding quick enough."[58] He further stated, "There were other people, but I live just a short distance from Lawton and when staff had difficulties I didn't think that explaining the rules to somebody would be that difficult, there would be a conflict. I wasn't taking an action, I didn't issue any citations to anybody. I was trying to make sure that everybody was following the rules."[59]

¶ 31 Under the circumstances, OESC has not shown that Evans acted consciously and deliberately to the detriment of the interests of OSDH. It has not been sufficiently shown that Evans acted other than within the bounds of his authority as Chief of the Consumer Health Service to carry out the regulatory duties that position obligated him to perform. OESC failed to present a record

---

54. R., p. 183.

55. Transcript of Comanche County District Court hearing held on October 1, 2008, p. 26.

56. *Id.,* pp. 31–33.

57. R., pp. 75–78.

58. R., p. 190.

59. *Id.*

that demonstrated a willful or wanton disregard of OSDH's interests through either deliberate violations or disregard of reasonable employer standards of behavior; or through carelessness or negligence of such a degree as to manifest equal culpability, wrongful intent or evil design; or through an intentional and substantial disregard of OSDH's interests or of Evans' professional duties and obligations. Like the employee in *MacFarlane v. Commonwealth of Pennsylvania Unemployment Compensation Board of Review*,[60] Evans verbally disclosed his conflict of interest to his previous supervisor. For at least seven months, OSDH failed to take any disciplinary action against Evans or take any steps to ensure Evans did not engage in conduct that could give rise to an improper conflict of interest. There is no evidence he favored his son or treated any tattoo establishment unfairly. Rather, the findings of the Board of Review, which are supported by the evidence, reveal that Evans acted pursuant to and within the bounds of his authority and duties. Therefore, we hold that Evans' actions do not disqualify him from unemployment benefits because they do not constitute "misconduct" under § 2–406 as a matter of law.

## CONCLUSION

¶ 32 In light of the Board of Review's adoption of the findings of fact made by the Appeal Tribunal, as supported by the evidence, we hold that Evans' actions, performed in the course of his duties and with no evidence of intent to act contrary to his employer's best interests, do not constitute "misconduct" as a matter of law pursuant to 40 O.S.2001 § 2–406. Therefore, we find that Evans is not disqualified from unemployment compensation. We affirm the district court's order granting unemployment benefits to Evans.

¶ 33 **AFFIRMED.**

FISCHER, P.J., concurs, and WISEMAN, C.J., concurs in result.

Court of Civil Appeals of Oklahoma, Division No. 1.

---

60. In *MacFarlane v. Commonwealth of Pennsylvania Unemployment Compensation Board of Review*, an employee was discharged for failing to disclose certain adverse health conditions on his employment application even though he had previously disclosed the health conditions orally during an interview. 12 Pa.Cmwlth. 550, 317 A.2d 324 (1974). In holding that the omission did not constitute disqualifying misconduct because the employee had no intent to deceive, the court stated:

In all the[ ] definitions [of "misconduct"] there is an element indicating a consciousness of wrongdoing on the part of the employe [sic]. The use of such words as "wanton or willful," "deliberate," "disregard," "intentional," and "negligence in such degree or recurrence as to manifest culpability, wrongful intent, or evil design" indicates that an employe [sic] is only guilty of wil[l]ful misconduct when he is, or should be, under the circumstances, conscious that his actions are inimical to the interests of his employer.

*Id.* at 317 A.2d at 326.